536 So.2d 705 (1988)
Eldon Lee SAYES, PlaintiffAppellee,
v.
PILGRIM MANOR NURSING HOME, INC., et al., DefendantsAppellants.
No. 87-993.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1988.
*706 Henry Lemoine, Pineville, for plaintiff-appellee.
Gist, Methvin, Hughes & Munsterman, David Hughes, Gold, Weems, Bruser, Sharp, Sues & Rundell, Peggy St. John, Alexandria, for defendants-appellants.
Before DOMENGEAUX, DOUCET and YELVERTON, JJ.
DOMENGEAUX, Judge.
Defendants-appellants, Pilgrim Manor Nursing Home, Inc., HRH Management Association and Hartford Accident & Indemnity Company, appeal the District Court judgment awarding the plaintiff-appellee, Eldon Lee Sayes, $270,708.86 for injuries he sustained while acting as the Police Chief of Pineville, La., after he physically subdued a suicidal patient of the nursing home. The plaintiff has answered the appeal claiming manifest error in the award and has asked that the award be increased.

FACTS
On July 18, 1985, the Pineville Police Department received a phone call from the Pilgrim Manor Nursing Home informing them that Bernice Davis, a patient of the home, was missing from the premises. Ms. Davis, a thirty-one year old mentally retarded, psychotic, epileptic was reportedly threatening to commit suicide in Tudor Lake, a nearby sewerage waste reservoir. Three officers responded to the call and, upon arriving at Tudor Lake, saw Ms. Davis wading in waist to neck deep water alternately cursing and yelling "I'm coming Lord". No nursing home personnel were in attendance. Unsure of how to retrieve her, the responding officers radioed for a boat. In the meantime, they stayed out of sight so as not to agitate Ms. Davis and observed her as she continuously screamed and waded about the lake.
The Pineville Chief of Police, plaintiff Eldon Sayes, heard the original emergency radio transmission and decided to assist as a backup. Arriving at the lake approximately an hour after the original three officers did, Chief Sayes approached a nearby officer for information. He was told that there was a woman in the lake threatening to commit suicide. Chief Sayes then walked to the southside of the lake and, while hidden behind a tree, observed Ms. Davis standing approximately ten to fifteen feet away, wading towards the deep end of the lake, continually screaming "I'll be there soon, Lord". Believing that her suicide attempt was eminent, *707 Chief Sayes dove into the water. An extremely violent struggle ensued, after which Ms. Davis went completely limp. Chief Sayes carried her to the bank. Ms. Davis then had an epileptic grand mal seizure.
Immediately after the struggle, Chief Sayes noticed a pain in his left arm, particularly around his elbow. He went home, showered and noticed that the pain was increasing. He was admitted to the Rapides General Emergency Room whereby it was discovered that his elbow was broken.
As of the time of trial, the plaintiff has had five (5) operations on his left elbow. He has had an artificial elbow implanted which has placed severe restrictions on his physical activity. Dr. Ray J. Haddad, the plaintiff's primary treating physician and the surgeon who performed the last three operations on the plaintiff's elbow, advised the plaintiff to refrain from using his left arm in any strenuous or jolting manner as this would cause the fragile artificial elbow to break. The plaintiff was restricted to lifting objects weighing only fifteen pounds or less. Due to the severe limitations placed on his physical activity, the plaintiff was forced to resign as Chief of Police and go into early retirement. The plaintiff was forty-one years old at the time of his resignation and had served a total of eighteen years on the Pineville Police Department, five of these years as the Police Chief.
The plaintiff sued Pilgrim Manor Nursing Home alleging that his injuries were the result of Pilgrim Manor's negligent care and supervision of their patient, Ms. Davis.
At the trial, evidence was presented of the standard of care and supervision Pilgrim Manor exercised over Ms. Davis. As previously stated, Bernice Davis was a thirty-one year old mentally retarded (I.Q. of 53) female suffering from epilepsy with grand mal seizures. She was initially admitted to Central Louisiana State Hospital in 1967, and, at the time of trial, had been readmitted on sixteen (16) separate occasions. She was admitted each time because of violent, combative, destructive and suicidal behavior and the duration of her commitments in Central varied from a few months to over a year at a time.
In the beginning, Bernice was usually discharged from Central to the custody of her parents. However, because her parents were unable to adequately control her, she eventually began to be placed in various nursing homes. After staying at several nursing homes that were also unable to control her, Bernice was admitted to Pilgrim Manor Nursing Home on December 2, 1981. Bernice's admittance records show that Pilgrim Manor voluntarily accepted Bernice with full knowledge of her mental and physical disorders. During her four year stay at Pilgrim Manor, Bernice was readmitted to Central on four additional occasions, again due to her violent and/or destructive outbursts.
When Bernice was initially admitted to Central in 1967, she was diagnosed as having "chronic brain syndrome with psychotic reaction". In 1985, she was described by her treating physician at Pilgrim Manor, Dr. Grover C. Bahm, as "emotionally labile with hostile reactions", or calm and cooperative one day and hostile and combative the next. During Dr. Bahm's deposition he further stated:
Well I believe Bernice, if I remember correctly she at times would appear near normal, and then she would have episodes of getting I would have to say psychotic behavior, and during the time that she was normal she caused very little trouble, but when she would becomestarted acting psychoticdemonstrating some psychotic behavior then she would definitely have to be monitored pretty close during that period of time. (Bahm deposition pp. 10-11).
Dr. Bahm had issued standing orders that Bernice could be restrained for self-protection and the protection of others if her behavior became violent.
A review of Bernice's medical records indicated that throughout her treatment at Central she exhibited suicidal ideation. In fact, during her stay at Pilgrim Manor, she made one prior suicide attempt in another nearby lake before the incident which gave rise to this lawsuit. During his deposition, *708 Dr. Bahm stated that a person with Bernice's problems should not have been given the freedom to leave the nursing home at will.
Despite Dr. Bahm's opinion and despite Bernice's apparent and documented serious mental and physical problems, the Administrator and the Director of Nurses at Pilgrim Manor testified that Bernice had complete freedom to leave the nursing home premises, either alone or in the company of other residents. In fact, she did not even have to "sign out" unless it was for a trip of more than a day's duration. During her four year stay at Pilgrim Manor Bernice was frequently picked up by the Pineville Police for causing a disturbance in the surrounding neighborhood.
Police reports indicated that Pilgrim Manor routinely telephoned the Pineville Police Department to provide assistance when a resident became hostile, disruptive or combative. Pilgrim Manor employed no security guards for this purpose and only employed one male orderly, scheduled generally for the weekends. Police records showed that from 1980 to 1985, Pineville Police made fifty-nine (59) visits to Pilgrim Manor. For the first six months of 1985 alone, the police received sixteen (16) calls from Pilgrim Manor, seven (7) of these because of a disturbance of some sort caused by Bernice Davis.
The plaintiff introduced evidence of Bernice's behavior on the days proceeding the Tudor Lake incident and the lack of supervision Pilgrim Manor exercised over her. On July 16, 1985, at 12:45 p.m., two days before Bernice's attempted suicide in Tudor Lake, she received a phone call with information that her brother had broken his neck in an automobile accident and was in critical condition. The nurse's notes commented that Bernice was "very upset" and "extra TLC" was given. On the following day, July 17, 1985, during the noon meal, Bernice became very agitated and began cursing and fighting with another resident. Bernice was sent to her room to finish her meal. An hour later, at 1:15 p.m., the police picked her up in the neighborhood for disturbing the peace. Upon her return Bernice refused to go to her room. The nurse's notes indicated that she was left alone outside. By 4:00 p.m. on this day, Bernice was ambulating and refusing to take her daily anti-convulsion medication. The nurse's notes observed that she was still upset from the noon meal altercation. She also refused her 6:00 p.m. supper and her 8:00 p.m. medication. At 9:00 p.m., in the lobby, she began arguing with another patient. After separating her from the other patient, Bernice was sent to her room. She immediately proceeded to leave her room and then, unattended, leave the premises. By 9:30 p.m., she returned to the nursing home "somewhat calmed". When she woke up on July 18, 1985, the day of the Tudor Lake incident, Bernice was "grumpy" and refused to keep her doctor's appointment scheduled for later that afternoon. At 11:45 a.m. "her boyfriend", George Dixon, notified the nurses that Bernice was in water up to her neck in Tudor Lake. When asked by the staff why she was there, George stated that Bernice was "made at Roosevelt Thomas", the resident with whom she had fought during the proceeding day's noon meal. After notifying the Pineville Police of Bernice's attempted suicide, two nurses went in search of Bernice. Unable to find her in or around the lake, the staff returned and again called the Pineville Police. The day's events culminated in Bernice's subsequent confrontation with Chief Sayes as was discussed, infra.
After a trial on the merits, the District Court ruled in favor of the plaintiff and held that Pilgrim Manor had been negligent in repeatedly allowing Bernice Davis to leave the premises, unattended. The Court further found that, although the plaintiff was injured while acting in his capacity as a police officer, the jurisprudentially defined "fireman's rule" which prohibits professional rescurers from suing a negligent party, was not applicable. The Court then awarded the plaintiff $60,000.00 for past and future pain and suffering, $150,000.00 for future lost wages, and $14,716.00 for past lost wages plus all medical expenses.
*709 The defendants have appealed this judgment and have assigned three assignments of error:
1. The Trial Court erred in determining that Pilgrim Manor was negligent in its supervision of Bernice Davis.
2. The Trial Court erred in determining that Pilgrim Manor breached a duty to the plaintiff Eldon Lee Sayes.
3. The Trial Court erred in determining that the plaintiff was not contributorily negligent or assumed the risk of the accident.
The plaintiff has answered the appeal and asks this Court to increase the plaintiff's pain and suffering award and his award for loss of future income.

NURSING HOME STANDARD OF CARE
The defendants contend that the Trial Court erred in determining that Pilgrim Manor was negligent in its care and supervision of Bernice Davis.
While a nursing home is not the insurer of the safety of its patients, the nursing home does have a duty to provide a reasonable standard of care, taking into consideration the patient's mental and physical condition. McGillivray v. Rapides Iberia Management Ent., 493 So.2d 819 (La.App. 2nd Cir.1986); Nichols v. Green Acres Rest Home, Inc., 245 So.2d 544 (La.App. 3rd Cir.1971).
In its reasons for judgment the Trial Court stated:
It is evident that Pilgrim Manor was aware of the sometimes bizzare behavior of Ms. Davis. They knew or should have known of her mental condition and her history while a patient at Central State Hospital. They knew or should have known of her physical condition. Neither her physical, mental or emotional condition could be considered normal. Clearly extra precautions should have been taken to protect Ms. Davis from harming herself or harming others.
Having accepted a patient from a mental institution Pilgrim Manor was obligated to take extra care and precautions to assure her and the public that she could not injure herself or others.
Immediately preceeding this unfortunate injury Ms. Davis had been exhibiting behavior which should have placed Pilgrim Manor on notice that Ms. Davis was likely to engage in conduct which would be detrimental to herself or to others. Ms. Davis had an extensive history of leaving the nursing home and had previously indicated that she was suicidal. By accepting her with full knowledge of her condition the nursing home was bound and obligated to take extra care, over and above that given other patients, to protect her and others who could be forseeably damaged by her. Pilgrim Manor failed and neglected to take any precautions whatsoever.
The evidence presented at the trial strongly supports the Trial Judge's conclusions. Not only had Pilgrim Manor received Central's medical records on Ms. Davis which showed that she was psychotic, mentally retarded and epileptic with suicidal ideation, Ms. Davis, while living at Pilgrim Manor, had exhibited all of these characteristics on several occasions so that the staff at Pilgrim Manor were clearly aware of her condition and propensities. By accepting this patient with knowledge of her mental and physical problems, we agree with the Trial Court in its conclusion that Pilgrim Manor was under a duty to provide a greater degree of care in preventing Ms. Davis from creating a risk of harm to herself and to others. At the very least, as was admitted to by Dr. Bahm, her treating physician, she should not have been allowed unsupervised leave.
Pilgrim Manor presented no evidence that extra care was given to Ms. Davis. Instead, the evidence showed that she was treated like any other resident who had nominal physical or mental disabilities. She was free to, and often did, leave the nursing home unattended and unsupervised and was frequently picked up in the surrounding neighborhood by the police for disturbing the peace.
In the two days before the Tudor Lake incident, Ms. Davis manifested several *710 warning signs of a future major confrontation but these warning signs went unheeded by the Pilgrim Manor staff. She was agitated by the phone call regarding her brother's broken neck. On the day before the incident, she fought with another resident and refused to take her epileptic seizure medication. On this same afternoon, she was picked up by the police for creating a disturbance in the neighborhood. That night, in the lobby of the nursing home, she argued with another resident and then, clearly agitated, left the nursing home premises. When she returned she was "somewhat calmed". The Tudor Lake incident occurred the next morning. Clearly, the long term history and immediate preceeding behavior of Bernice Davis put the nursing home on notice of impending danger to herself and to others. For these reasons we find no error in the Trial Court's determination that Pilgrim Manor was negligent in its supervision and care of Bernice Davis.

FIREMAN'S RULE
The defendant's final two assignments of error contend that the Trial Judge erred in refusing to apply the jurisprudentially defined "fireman's rule" which would have barred the plaintiff's recovery. This rule essentially states that a professional rescuer, such as a fireman or a policeman, who is injured in the performance of his duties, "assumes the risk" of such an injury and is not entitled to damages. See, Thompson v. Warehouse Corporation of America, Inc., 337 So.2d 572 (La.App. 4th Cir.1976). The defendants have argued in the alternative that the plaintiff was contributorily negligent in causing his own injury.
It is well recognized that firemen, police officers and others who, in their profession of protecting life and property necessarily endanger their safety do not assume the risk of all injury without recourse against others. Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (La. 1971). In Langlois, the Court ruled that a professional rescuer may recover for an injury caused by a risk which is independent of the emergency or problem he has assumed the duty to recover. In other words, the professional rescurer was found to have not assumed the risk of the hazardous situation that caused his injury.
In its reasons for judgment, the Trial Court stated:
Where a police officer is called he can reasonably expect an altercation to occur and in the great majority of those case negligence on the part of someone could be found. Public policy would deem it necessary that a police officer not have a cause of action for injuries every time he was called to a disturbance.
The case at bar is however, unique and distinguishable from those cited by defendant. Pilgrim Manor took no precautions whatsoever to supervise Ms. Davis. They did not timely give her prescribed medications. They knew of her propensities to leave the home, they knew of her suicidal tendencies and had on several other occasions called upon the Pineville Police Department for assistance. Pilgrim Manor had in effect utilized the Pineville Police Department as their own security staff. Public policy does not compel a policeman or fireman to take the same risk on numerous occasions when there are no precautions taken to prevent the reoccurrence of the event. If one intentionally sets fire to a building on numerous occasions he cannot expect to avoid liability for injury to the fireman who repeatedly responds to the call. Thus this particular case is not one in which the `fireman's rule' should be applied.
Police officers and firemen cannot be expected to expose themselves to injury from negligent conduct which has occurred on a repeated basis and which could have been prevented.
Once Ms. Davis created a foreseeable risk of harm to a third party, even a policeman, defendant was obligated to take whatever actions were necessary to prevent the same conduct from occurring in the future. This they failed to do.
It is apparent from a reading of the Trial Court's reasons that the Court found that *711 the plaintiff had assumed the risk that he would be injured in a confrontation with Ms. Davis. Nonetheless, the Court ruled that the plaintiff should recover because of the nursing home's repeated acts of negligence in allowing the dangerous situation with Ms. Davis to reoccur. Generally, Courts have denied recovery to the professional rescuer when the injury he incurred is in connection with the risk he professionally assumed. See, Thompson v. Warehouse Corporation of America, Inc., supra; Solis v. Civic Ctr. Site Development Co., Inc., 385 So.2d 1229 (La.App. 4th Cir.1980).
Our review of the jurisprudence finds no case which establishes another "exception" to the fireman's rule besides that as outlined in Langlois, supra. Therefore, under the established jurisprudence, the Trial Court's finding that the plaintiff had assumed the risk should have barred his recovery.
However, in Chinigo v. Geismar Marine, Inc., 512 So.2d 487 (La.App. 1st Cir.); writ denied, 514 So.2d 457 (La.1987), the First Circuit's opinion included an excerpt from Comment, Negligence Actions by Police Officers and Firefighters: A Need for a Professional Rescuers Rule, 66 Cal. L.Rev. 585, 598-602 (1978), and in pertinent part stated:
The professional rescuers rule would operate as follows. Once a risk is properly classified as independent, the assumption rationale is inapplicable. The professional rescuer would recover for negligently caused injuries attributable to such a risk. Although the assumption rationale will bar recovery for most dependent risks, recovery should be permitted for certain dependent risks for two reasons. First, an equitable interpretation of the agreement between firefighters or police officers and the employer may lead to the conclusion that some dependent risks encountered by the professional rescuers are so extraordinary that it cannot be said that the parties intended the rescuers to assume them. Second, some conduct of the defendant may be so blameworthy that tort recovery should be imposed for the purposes of punishment or deterrence....

The second type of dependent risk for which recovery should be available, a blameworthy risk, will arise in either of two circumstances: (1) where a citizen's conduct varies from the standard of reasonable care to such a degree that society's needs to punish or prevent the conduct exceeds the benefits gained from other tort goals; or (2) where the conduct varies from the standard of reasonable care to such a degree that it cannot be said that the professional rescuer consented to relieve the defendant of the duty of that standard of care. For example, it has been recognized that intentional torts against professional rescuers create liability even when the risk that causes injury is created by the emergency that the professional rescuer seeks to relieve. The concept of recklessness provides a threshold level of blameworthiness that will permit more certain and consistent judicial action while eliminating an increase in unmeritorious claims. Moreover, it is common in tort law to impose liability for aggravated conduct in instances where ordinary negligence will not create liability. [Footnotes omitted.] 512 So.2d at 490-91.
We agree with the article's conclusion that a professional rescuer should be allowed recovery in a situation where the conduct of the defendant is so blameworthy that liability is imposed in order to deter future acts of repeated negligence. However, in order to allow a professional rescuer such recovery, the defendant's actions or lack of actions have to rise to the level of recklessness or wanton negligence. This has been defined as the heedless disregard for others' rights with the consciousness that the act or omission to act may result in injury to another. Lipscomb v. News Star World Pub. Corporation, 5 So.2d 41 (La.App. 2nd Cir.1941).
While the Trial Court failed to use the words "reckless and wanton" in describing the defendant's actions, we note that the Trial Court's written reasons concluded that Pilgrim Manor's refusal to exert control *712 over Ms. Davis was in complete disregard to the rights of others and consciously presented a great risk of harm to the community. We agree that Pilgrim Manor's failure to act amounted to reckless and wanton negligence, conduct which prohibits invocation of the fireman's rule.
Finally, the defendants assert that the plaintiff was contributorily negligent in his rescue of Ms. Davis. Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. The standard of conduct to which the plaintiff must conform for his own protection is the subjective standard of a reasonable man under like circumstances. Dupas v. City of New Orleans, 354 So.2d 1311 (La.1978).
We find no contributory negligence on the part of the plaintiff in his rescue of Ms. Davis. Upon arriving at the lake he conferred with another officer to obtain information. After this he waited behind the tree until Ms. Davis was ten to fifteen feet away. The plaintiff was faced with an emergency situation whereby Ms. Davis was heading toward the deep end of the lake and was clearly making reference to an impending suicide attempt. His decision to jump into the lake and save Ms. Davis was not only non-negligent but was a prudent and heroic act under the circumstances. We find no contributory negligence on the part of the plaintiff.

QUANTUM
The plaintiff has asked for an increase in the quantum award from $270,708.86 to $1,085,276.00. The Trial Court awarded $60,000.00 for past and future pain and suffering, $150,000.00 for future lost wages and $14,716.00 for past lost wages plus medical expenses. The plaintiff asks this Court to increase his past and future pain and suffering award and his award for future lost wages.
The standard of appellate review of quantum awards is well established: before a Court of Appeal can disturb a quantum award made by the Trial Court, the record must clearly reveal that the trier of fact abused its much discretion in making this award; only after making a finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award and then only to the extent of lowering it or raising it to the highest or lowest point which is reasonably within the discretion afforded to that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
In the assessment of damages in cases of quasi-offenses, much discretion must be left to the judge or jury. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
Although the plaintiff testified that he experienced much pain immediately after his ordeal in Tudor Lake, and that he had undergone five operations on his left elbow, he is apparently no longer in pain. He also can no longer participate in many recreational activities that he once enjoyed such as hunting or skiing. While the award of $60,000.00 appears to be within the lowest permissible range, it does not appear to be an award that is an abuse of discretion.
However, the award of $150,000.00 in future lost wages appears to be an inadequate award in light of the uncontradicted evidence presented at the trial by the plaintiff. Dr. George Rice, the plaintiff's expert economist, estimated that the plaintiff had a future work life expectancy of 23.47 years and, at the salary the plaintiff was receiving just before his resignation, $20,819.12, with an annual raise of four and one-half percent and an overall discount of seven percent, the plaintiff's estimated loss of future earnings was $370,560.00. Apparently the Trial Judge reduced this award to $150,000.00 on the basis that the plaintiff would be receiving disability retirement benefits of $958.00 per month until the age of fifty-five, at which time the payments will decrease to a rate of fifty-five percent of the plaintiff's average salary for the last three years of his employment. The Trial Judge must have concluded that these disability benefits offset the amount the plaintiff was owed in future lost wages. While we agree that these payments do compensate the plaintiff for some of his future lost wages, we feel that they do not compensate him as adequately as the Trial Court believed. We reach this *713 decision after taking into account the fact that, because of this accident, the plaintiff was forced to retire one and one-half years before reaching his twenty year anniversary with the Pineville Police Department. Consequently, he will now be receiving a lower retirement benefit rate of pay at age fifty-five than he would have had he retired after twenty years of service.
The plaintiff is presently unemployed and can do no activity that would expose him to any type of sudden movement with his left arm. While there was no testimony that the plaintiff was totally work disabled, the severe restrictions on his physical movements apparently place him in an almost unemployable posture. Based on the evidence presented at trial, we find that the lowest possible amount the plaintiff could have been awarded for his future lost wages was $200,000.00. Hence we amend the judgment to increase the plaintiff's award of future lost wages from $150,000.00 to $200,000.00.
For the foregoing reasons, the judgment of the District Court is amended to increase the plaintiff's award for loss of future earnings from $150,000.00 to $200,000.00. The judgment is otherwise affirmed.
Costs on appeal are assessed against the defendants.
AFFIRMED AS AMENDED.