697 So.2d 750 (1997)
Jason MULLINS
v.
STATE FARM FIRE AND CASUALTY CO. and Charles Mitchell.
No. 96 CA 0629.
Court of Appeal of Louisiana, First Circuit.
June 27, 1997.
*751 Steve Joffrion, Gonzales, for Plaintiff/Appellee, Jason Mullins.
W. Ransom Pipes, Lauren J. Davis, Baton Rouge, for Defendants/Appellants, State Farm Fire and Casualty Co. and Charles Mitchell.
Before CARTER, LeBLANC, GONZALES, PARRO and FITZSIMMONS, JJ.
GONZALES, Judge.
This is an appeal from a trial court judgment, awarding a volunteer firefighter damages for injuries sustained while extinguishing a fire.

FACTS
On March 14, 1994, Todd Rougeou, an employee of Dr. Charles Mitchell, was working at the Mitchell residence, along with construction crews, in connection with certain renovations being made to the residence. Upon completion of the day's work, Rougeou decided to finish burning a stump, which he had begun to burn two nights earlier. Rougeou gathered scrap lumber, placed it on the stump, and started a fire. Rougeou tended the fire until the flames were diminished and only embers remained. Thereafter, Rougeou went to the opposite side of the residence where he began jackhammering. After approximately thirty minutes had elapsed, Rougeou noticed a cloud of black smoke emanating from the area where he had previously burned the stump. Upon investigating the cause of the smoke, Rougeou discovered that the top left corner of the second floor of the house was on fire.
*752 Shortly thereafter, the Prairieville Volunteer Fire Department arrived and began to extinguish the fire, which by that time had engulfed the entire house. While the fire was being extinguished, a brick wall inside the house collapsed on one of the firefighters, Jason Mullins, and he was injured.
On December 13, 1994, Mullins filed an action for damages, naming as defendants Dr. Charles Mitchell and his homeowner's liability insurer, State Farm Fire and Casualty Company (State Farm). The defendants answered Mullins' petition, denying the allegations. The defendants contended that Mullins' negligence was the sole cause of his injuries and that, because Mullins had assumed the risks associated with his responsibilities as a firefighter, recovery was barred under the "fireman's rule." The defendants alternatively contended that Mullins was comparatively negligent.
On September 20, 1995, the defendants filed a motion for summary judgment, contending that Mullins' recovery was barred by the "fireman's rule," and because of the lack of proof by Mullins of gross negligence on the part of Dr. Mitchell or Rougeau. On October 18, 1995, the trial court signed a judgment denying the defendants' motion for summary judgment.
On January 9, 1996, trial on the merits was held. The parties stipulated that the cause of the March 14, 1994 fire was a spark from the burning stump. After hearing all of the testimony and considering all of the evidence, the trial court found that Todd Rougeou was grossly negligent in setting the fire and rendered judgment in favor of Mullins, awarding him $20,000.00 in general and special damages, plus interest from date of judicial demand. The trial court signed a written judgment to this effect on January 17, 1996. The court fixed expert witness fees for James LeBlanc and Danny Thibodeaux at $400.00 each and taxed these fees as costs against the defendants.
The defendants appealed, assigning the following specifications of error:
1. The trial court erred in finding that Dr. Mitchell's employee, Todd Rougeou, was grossly negligent in causing the house fire and thus was liable for the injuries sustained by the plaintiff/firefighter when a wall of the burning house fell upon him during his attempts to extinguish the fire.
2. The trial court erred in taxing $400.00, per witness, in expert fees as costs for plaintiff's two witnesses as the fees were improper, or, in the alternative, excessive in light of the brevity of their testimony and the fact that they only testified in their official capacity as firefighters for the Prairieville Fire Department, not as experts.

FIREMAN'S RULE
The defendants contend that, because the "fireman's rule" barred Mullins' recovery, the trial court erred in allowing Mullins to recover damages.
Essentially, the "fireman's rule" states that a professional rescuer injured in the performance of his professional duties "assumes the risk" of such injury and is not entitled to damages. Worley v. Winston, 550 So.2d 694, 696 (La.App. 2d Cir.), writ denied, 551 So.2d 1342 (La.1989). However, firemen, police officers, and others who, in their professions of protecting life and property, necessarily endanger their safety do not assume the risk of all injury without recourse against others. Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133, 141 (1971).
A professional rescuer may recover for an injury caused by a risk which is independent of the emergency or problem he has assumed the duty to remedy. Langlois v. Allied Chemical Corporation, 249 So.2d at 141; Raziano v. Lincoln Property Company, 520 So.2d 1213, 1217 (La.App. 5th Cir.1988). A risk is independent of the task, and the assumption of the risk rationale does not bar recovery, if the risk-generating object could pose the risk to the rescuer in the absence of the emergency or specific problem undertaken. Worley v. Winston, 550 So.2d at 697.
On the other hand, "dependent" risks arise from the very emergency that the professional rescuer was hired to remedy. The assumption rationale bars recovery from most dependent risks except when (1) the dependent risks encountered by the professional *753 rescuers are so extraordinary that it cannot be said that the parties intended the rescuers to assume them, Chinigo v. Geismar Marine, Inc., 512 So.2d 487, 491 (La. App. 1st Cir.), writs denied, 514 So.2d 457 (La.1987), or (2) the conduct of the defendant may be so blameworthy that tort recovery should be imposed for the purposes of punishment or deterrence. Worley v. Winston, 550 So.2d at 697; Sayes v. Pilgrim Manor Nursing Home, Inc., 536 So.2d 705, 710 (La. App. 3d Cir.1988); Thompson v. Warehouse Corporation of America, Inc., 337 So.2d 572, 573 (La.App. 4th Cir.1976).
The risk at issue in the present case is the collapse of an interior brick wall upon Mullins as he attempted to put out a fire inside of the burning house. Such a risk is clearly a dependent risk of firefighting, in that it arises from the very emergency that Mullins was hired to remedy. It is also clear that the collapse of a wall in a burning house is an ordinary risk of firefighting, as opposed to an extraordinary risk[1] of firefighting, and that the first exception to the applicability of the fireman's rule is inapposite herein. Therefore, in order for Mullins to recover for his injuries, it must be shown that the conduct of Rougeau was so blameworthy that tort recovery should be imposed for punishment or deterrence purposes.
In those cases where a rescuer has been allowed to recover for injuries caused by a dependent risk, because the defendant's conduct was so blameworthy as to warrant recovery, the courts have used various terminology to describe the type of blameworthy conduct involved. In Worley v. Winston, 550 So.2d at 697, the Second Circuit Court of Appeal found that the defendant's conduct was "not only highly blameworthy but was also criminal." In Sayes v. Pilgrim Manor Nursing Home, Inc., 536 So.2d at 711, the Third Circuit Court of Appeal found that in order to allow a professional rescuer recovery, the defendant's actions or lack of actions have to rise to the level of "recklessness or wanton negligence." In Thompson v. Warehouse Corporation of America, Inc., 337 So.2d at 573, the Fourth Circuit Court of Appeal stated in dicta, "In the absence of proof of personal negligence so gross as to be tantamount to arson or to trap-setting by the owner, we cannot hold a building owner liable to firefighters for negligence causing or worsening fire which caused the firefighters' injury." Further, in Chinigo v. Geismar Marine, Inc., 512 So.2d at 491, this court cited Comment, Negligence Actions by Police Officers and Firefighters: A Need for a Professional Rescuers Rule, 66 Cal.L.Rev. 585, 598-602 (1978), wherein it was explained that "[t]he concept of recklessness provides a threshold level of blameworthiness" for the *754 imposition of liability, and that it was common in tort law to impose liability for "aggravated conduct in instances where ordinary negligence will not create liability."
In the present case, the trial court determined that Rougeau's actions, in igniting a fire in such close proximity to the house under construction on a windy day, amounted to gross negligence. Although we agree that conduct rising to the level of gross negligence falls within the parameters of "blameworthiness" as described by the various courts of appeal, we conclude that the trial court erred in finding that Rougeau's actions met this level of blameworthiness.
In Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216, 219-220, our supreme court reviewed numerous definitions of gross negligence as follows:
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed. 1984); 65 C.J.S. Negligence, § 8(4)(a), at 539-40 (1966 & Supp.1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
The above excerpt demonstrates that the difference between ordinary negligence and gross negligence is the level or degree of lack of care shown by the offending party. To amount to gross negligence, the conduct of the offender must not only show a lack of care, it must show an "entire," "utter," "complete," or "extreme" lack of care.
A trial court's finding of gross negligence is a factual finding which will not be disturbed on appeal in the absence of manifest error. Williams v. State, Department of Wildlife and, Fisheries, 95-2456 (La.App. 1st Cir. 11/20/96), 684 So.2d 1018, 1023, writ denied, 96-3069 (La. 3/7/97), 689 So.2d 1372; Falkowski v. Maurus, 637 So.2d at 528. To reverse a trial court's factual finding, an appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
Although deference to the factfinder should be accorded, the court of appeal nonetheless has a constitutional duty to review facts. Ambrose v. New Orleans Police Department Ambulance Service, 639 So.2d at 221. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 639 So.2d at 221.
The record does not support a conclusion that Todd Rougeau's actions on the day in question constituted gross negligence. The evidence at trial consisted of the testimony of Todd Rougeou, James E. LeBlanc, Danny P. Thibodeaux, and Jason Mullins.
*755 Todd Rougeou testified that he is employed by Dr. Charles Mitchell as a surgical assistant and, beginning in January of 1994, also assisted construction crews in renovating Dr. Mitchell's residence. Rougeou testified that, on March 14, 1994, after the construction work was completed for the day, he decided to finish burning a stump, which he had begun to burn two nights earlier. Rougeou indicated that the stump was located on a slope about three to four feet below the bottom level of the house and approximately twenty to twenty-five feet away from the house.[2] According to Rougeou, it had been very windy that day, but he noticed that the wind had calmed prior to his igniting the stump. Rougeou gathered scrap lumber, which was lying around the construction site, and used it to ignite the stump. Rougeou testified that he watched the fire until the flames had diminished, leaving only glowing embers. Rougeou indicated that, while the stump was burning, he had not encountered any problems with sparks flying toward the house and that the fire had never spread away from the stump. Rougeou stated that, before he left the stump unattended, the winds were calm. Rougeou then left the embers and went to the opposite side of the residence where he began jackhammering a brick wall. Approximately thirty minutes later, Rougeou noticed a black cloud of smoke rising above the roof of the house and went to investigate the cause. Rougeou discovered that the winds had picked up and that the top left corner of the second floor of the house was on fire.
James E. LeBlanc, chief of the Prairieville Volunteer Fire Department, was admitted by the trial court as an expert in the field of fire cause and origin. LeBlanc testified that he was the first firefighter to arrive at the fire scene on March 14, 1994, and that Rougeou was the only other person at the scene. Le-Blanc stated that Rougeou told him that he had started a small fire to burn a stump in the rear of the house and that, because the winds were heavy, he had waited until the flames diminished and then went to the opposite side of the house to do some jackhammering.
Upon his arrival at the fire scene, LeBlanc observed a three story building totally engulfed in flames. LeBlanc testified that the stump was located approximately fifteen to twenty feet from the house and that there was tar paper covering the house. According to LeBlanc, the weather conditions were extremely windy, with the wind blowing from the south to the north (from the rear of the house to the front of the house) at a speed of about fifteen to twenty miles per hour. Le-Blanc stated that the winds had been "very, very gusty" on the day of the fire. In Le-Blanc's expert opinion, a residence fire was certain or substantially certain to result given the proximity of the stump and the house, the fifteen to twenty mile per hour winds blowing from the direction of the stump to the house, the tar paper covering the house, and the fact that the stump was ignited, allowed to burn to embers, and then left alone.
Danny P. Thibodeaux was also admitted by the trial court as an expert in fire cause and origin. It was stipulated that, if Thibodeaux were asked the same questions as those asked to LeBlanc, his answers would be substantially the same. Specifically, with regard to the weather conditions on the day of the fire, Thibodeaux stated that the winds were gusty, blowing at approximately fifteen to twenty miles per hour.
Notably, the record indicates that neither LeBlanc nor Thibodeaux had exact knowledge of the wind conditions at the Mitchell residence at the time that Rougeau lit, attended, and left the fire.
Jason Mullins testified that he had been a firefighter with the Prairieville Volunteer Fire Department for approximately four to five years prior to the accident. Mullins indicated that he was injured when a brick wall inside the house collapsed and fell upon him. Mullins acknowledged that this was a *756 type of risk he would anticipate. According to Mullins, in his training with the fire department, he had learned that, when inside a burning residence, there is a risk that a wall or ceiling will collapse due to structural damage. Mullins also acknowledged that this was a risk assumed by all firefighters entering a fire-damaged residence.
After considering all of the evidence, the trial court determined that the actions of Todd Rougeou, in igniting a fire in such close proximity to a house under construction on a windy day, amounted to gross negligence. Accordingly, the trial court found that Mullins' recovery was not barred by the "fireman's rule" and rendered judgment in favor of Mullins. In his reasons for judgment, the trial court stated, in part, as follows:
Well, you do assume certain risk[s] when you are a volunteer fire department or any fireman for that matter. But the law does provide that if there is gross negligence on the part of the origin or cause of the fire, that he or she is entitled to recovery. I think it's obvious from the evidence and I really mean obvious, that anyone of any capabilities would know not to light a fire twenty feet from a house that's under construction on a windy day. It doesn't take a [Rhodes] scholar or a genius to know that that does  that probably will cause a fire and he didn't. Mr[.] Rougeou knew that it would probably cause a fire, that's why he sat around and waited for it to go out, but it didn't go out. It was his gross negligence that it hadn't gone out all together before he went to the front, it caught the house on fire, this gentleman was innocently injured because of that. That's gross negligence.
We have thoroughly reviewed the entire record in this matter and find that it does not support a conclusion that Rougeau was grossly negligent in setting the fire or in leaving the fire when there were embers remaining. Given his testimony that the earlier winds had calmed when he lit the fire, that he watched the stump burn from the time it was lit to the time that it was reduced to embers, and that he did not leave the fire until only embers remained, we cannot say that Rougeau's conduct exhibits an "entire," "utter," "complete," or "extreme" lack of care. Rougeau's testimony regarding the wind conditions when he lit, attended, and left the fire is entitled to more weight than is the testimony of LeBlanc and Thibodeaux, both of whom could only testify as to the general wind conditions in the vicinity on the day in question, rather than to the conditions at the Mitchell residence itself and at the precise time that Rougeau lit, attended, and left the fire unattended.
Had he left a live fire unattended in raging winds, perhaps Rougeau's conduct could be classified as grossly negligent. However, such is not the case; Rougeau merely exercised poor judgment in failing to make sure that the fire was completely extinguished before leaving it unattended. Although this conduct may be negligent, it is not grossly negligent. If such were the case, virtually every hunter, camper, or homeowner in Louisiana who walks away from a fire reduced to embers on a windy day in spring time would be guilty of gross negligence. This interpretation is much too broad. The decision of the trial court, finding Rougeau guilty of gross negligence, is clearly wrong.

EXPERT WITNESS FEES
In their second assignment of error, defendants dispute the propriety of the trial court's award of expert witness fees as costs, as well as the amount taxed.
The trial court may render any judgment for costs, or any part thereof, against any party, as it may consider equitable. La. C.C.P. art. 1920. Generally, costs are to be paid by the party cast in judgment. La. C.C.P. art. 1920; Stockstill v. C.F. Industries, Inc., 94-2072 (La.App. 1st Cir. 12/15/95), 665 So.2d 802, 822, writ denied, 96-0149 (La. 3/15/96), 669 So.2d 428. However, on appeal, the appellate court may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable. La.C.C.P. art. 2164.
Because we find merit in the defendants' appeal, and reverse the trial court judgment rendered against them, we find it equitable to also reverse the award of expert *757 witness fees made by the trial court. Further, in view of the reversal of the trial court's award, we also find it equitable to tax the costs of this appeal against Mullins. See Gibbs v. Giering, 183 So.2d 459, 463 (La.App. 3d Cir.1966).

DECREE
For the foregoing reasons, the judgment of the trial court is REVERSED. Costs of this appeal are assessed against Jason Mullins.
LeBLANC, J., concurs.
CARTER, J., dissents and assigns reasons.
CARTER, Judge, dissents.
I respectfully disagree with the majority opinion and I would affirm the trial court judgment.
The majority opinion correctly sets forth that to reverse a trial court's factual findings, an appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83.
In Lirette v. State Farm Insurance Company, 563 So.2d 850, 852-53 (La.1990), the Louisiana Supreme Court reversed a judgment of this court, noting that we had improperly conducted a de novo review in disregarding portions of the plaintiff's witnesses' testimony and in concluding that the jury was manifestly erroneous in rejecting part of the testimony of the defendant's expert. In so doing, the supreme court reminded us of the principles of the manifest error-clearly wrong standard of review, stating:
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
When findings are based on determinations regarding the credibility of witnesses, the manifest error  clearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.
Lirette v. State Farm Insurance Company, 563 So.2d at 852-53. [Citations omitted.]
I further agree with the majority opinion that although deference to the factfinder should be accorded, the court of appeal nonetheless has a constitutional duty to review facts. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, p. 8 *758 (La. 7/5/94); 639 So.2d 216, 221. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 639 So.2d at 221.
A review of the entire record in this matter clearly reveals a reasonable basis exists for the trial court's finding that Rougeou was grossly negligent.
James E. LeBlanc, chief of the Prairieville Volunteer Fire Department at the time of the incident, testified as follows:
Q. And what were the wind conditions at the scene?
A. The wind conditions this day was [sic] very, very, [sic] gusty. They were very heavy. I even stated that in my narrative report, that I wrote the next day, how bad the winds were. If I had to put an estimate on it, they were at least fifteen, twenty miles per hour that day.
Q. In what direction were they gusting?
A. They were coming from the south, toward the north.
Q. All right. And, do you know what direction this home faces?
A. The front of the doctor's home faces the Baton Rouge area and the rear of the home faces the Geismar Chemical Plants. So the rear of the home is toward the south and the front of the home is toward the north.
Q. So that the wind would have been gusting, if your information is accurate, it would have been gusting from the back yard toward the back of the house?
A. It would have been gusting from the rear of the home, toward the front of the home.
Q. All right. Did you eventually talk to Mr[.] Rougeou about the fire, as part of your investigation sir?
A. I talked to Mr[.] Rougeou on several occasion[s], I talked to him during the fire and after the fire.
Q. And, did he make any statements to you about who started the fire, what the conditions were etcetera?
A. There was never no [sic] question who started it. He stated that right off the bat, that he started a small trash fire in the front of the house and that he sat there as much as the flames went down and then he walked away to the front of the house to do some jack hammering on a driveway. So there was never a question, the whole time I investigated this fire, on how it started because I was told right off the bat how it started.
Q. All right. Did he indicate to you what the wind conditions were when he started the fire?
A. He did indicate that the winds were heavy, that's why he stayed there until the flames kind of died down a little bit, until he walked around the front of the house and started his jack hammering.
Q. So is it your statement that he indicated to you that the winds were heavy when he started the fire?
A. That's correct.
* * * * * *
Q. Can you give us the approximate distance of the stump from the home?
A. The stump from the home, is approximately fifteen to twenty feet.
Q. All right. Now Chief LeBlanc, we've already stipulated that the cause of the fire was a spark that came, at some point in time, from the stump and caused portions of the home to become inflamed. My question to you is this: I'm going to ask  I'm going to give you a "hypothet" and ask your opinion, a hypothet  I want you to assume that there's a home located fifteen to twenty feet from the source of a fire, a thrash [sic] fire, built on top of a stump; I want you to further assume that at the time this fire was started there are winds *759 gusting fifteen to twenty miles per hour, that they had been gusting fifteen to twenty miles an hour all day, from the direction of the stump and fire toward the direction of the home; I want you to further assume that the rear portion of the home is exposed tar paper with no other covering material; I want to you to further assume that someone ignites this stump and thrash [sic], allows it to burn down to embers and then walks away; under those conditions, if you assume those conditions, would it be certain or substantially certain that the residence fire would result from that factual situation?
A. Definitely.
Q. All right. That would be your professional opinion?
A. Yes.
Q. And chief  you've already testified as to what Mr[.] Rougeou told you about the wind conditions at the time, do you have a[n] independent recollection of what the wind conditions were both that afternoon and at the time you arrived at the scene?
A. You want to know my opinion about that?
Q. I want your independent recollection of what the wind conditions were, this afternoon of this fire and at the time you arrived at the scene?
A. They were very, very gusty. It was so bad that during the fire, I finally had to move my fire truck because the wind was blowing flames and smoke so much on top of where my fire truck was, I thought I was going to have to shut the scene down and move my truck out of the way.
Q. And where were your trucks located?
MR[.] HEARD:
I object to his response as not be[ing] responsive to his question. The question was do you have an independent recollection of the fire that afternoon; I presume he was talking about the time the stump was ignited, not at the time the trucks were there.
THE COURT:
Do you want to be specific?
MR[.] JOFFRION:
I'll be specific.
Q. Do you have an independent recollection of the wind conditions the afternoon of the fire?
A. The afternoon of the fire the wind conditions were very gusty.
MR[.] HEARD:
Again You[r] Honor, just for the point of clarity; what time is [sic] that afternoon; are we talking about at the time he arrived at the scene or 
THE COURT:
You'll be allowed to cross-examine him.
Q. Now, do you have an independent recollection of what the wind conditions were when you arrived on the scene?
A. When I arrived on the scene, I do have a recollection because I parked my pickup truck where the flames and smoke were coming toward me and I had to move my truck out of the way.
Q. And what was your recollection of the wind conditions at the time you arrived?
A. Very gusty. Fifteen to twenty miles per hour, out of the south toward the north.
[Emphasis added.]
Danny P. Thibodaux, captain of the Prairieville Fire Department, testified as follows:
Q. Mr[.] Thibodeaux, you were in the courtroom during Chief LeBlanc's testimony; is that correct?
A. Yes.
Q. If we asked you the same questions that we asked Chief LeBlanc, would you answer them substantially the same?
A. Yes. The ones that I have knowledge of, yes.
Q. And obviously those that you do not have knowledge of, you would have no response?
A. Yes, sir.
Q. Could you just tell the Court, which areas that Mr[.] LeBlanc testified to, that you don't have any knowledge of? If that's okay with the Court?
*760 THE COURT:
Sure.
A. Any conditions inside the structure or anything like that, my knowledge would be of the outside conditions, to prevailing weather conditions, the fact that it was, you know, the day of this incident, the winds were extremely gusty, from fifteen to twenty miles per hour and the conditions  I ran the pump truck that Mr[.] LeBlanc referred to which is the main attack piece of equipment. And on several occasions we had to consider, as he stated, shutting down the operations and moving because of the conditions. But beyond that, I can't recall his previous testimony, exactly all the questions, that would be my opinion.
MR[.] PIPES:
Your Honor, in connection with the facts said, we'll go ahead and stipulate.
THE COURT:
Let it so be stipulated.
Given the testimony that, on the day of the fire, the conditions were windy, the stump was located in close proximity to the house which was under construction and covered with tar paper, and the glowing embers which remained after the fire were left unattended, the trial court believed that Mullins established, through expert testimony, that the house fire was substantially certain to occur. In reaching this factual determination, the trial judge apparently made credibility determinations, believing Chief LeBlanc and Captain Thibodeaux, and not believing Rougeou's testimony that it was not windy when he set the fire or left the glowing embers. Because the record supports such a finding, the majority opinion clearly errs in finding that the trial court was manifestly erroneous. Because the majority opinion reversed the finding of liability, it also reversed that part of the judgment that assessed defendant with expert witness fees. In addition to dissenting from the majority's reversal of liability, I also dissent from the reversal of the assessment of expert witness fees to defendant and the subsequent assessment of these fees to plaintiff.

EXPERT WITNESS FEES
The defendants contend that the trial court erred in taxing as costs, expert witness fees of $400.00 per witness for the testimony of LeBlanc and Thibodeaux. The defendants argue that these fees are improper because expert testimony was not necessary to establish the cause and origin of the fire. Alternatively, the defendants argue that the fees were excessive because LeBlanc and Thibodeaux testified only briefly, and because they testified as fact, rather than expert, witnesses.
The law is clear that to preserve the right to appeal an erroneous trial court ruling which admits evidence, the objecting party must make a timely objection and state the specific ground of objection. LSA-C.E. art. 103A(1); State v. McCutcheon, 93-0488, p. 10 (La.App. 1st Cir. 3/11/94); 633 So.2d 1338, 1343-44, writ denied, 94-0834 (La. 6/17/94); 638 So.2d 1093. The reasons for the objection must be sufficiently brought to the attention of the trial court to allow it the opportunity to make the proper ruling and prevent or cure any error. State v. McCutcheon, 633 So.2d at 1344.
In the instant case, both LeBlanc and Thibodeaux were tendered as expert witnesses. Although State Farm refused to enter into a stipulation with regard to LeBlanc's qualifications as an expert, State Farm did not object to LeBlanc's expert testimony on the grounds that expert witness testimony was unnecessary because the parties had stipulated to the cause and origin of the fire. With regard to Thibodeaux, State Farm objected at trial to his qualifications as an expert. However, State Farm failed to object on the grounds that because the cause and origin of the fire had been stipulated to, expert testimony was not required to establish the cause and origin of the fire. Because State Farm failed to articulate an objection that the expert witness testimony as to cause and origin was not necessary because of the stipulation as to cause and origin, there is nothing for us to review. See State v. McCutcheon, 633 So.2d at 1344.
With regard to the issue of the excessiveness of the expert witness fees established by *761 the trial court, LSA-R.S. 13:3662 A addresses the compensation of witnesses who appear in their official capacity as "fire service persons," among others, and provides, in pertinent part, as follows:
Each ... fire service person ... hereinafter sometimes collectively referred to as "witness", or "officer", who, because of his official capacity, is required to be present as a witness in any civil case or in any administrative hearing held pursuant to any law of this state ... shall be paid an appearance fee of forty dollars per day per case or per hearing, when the witness's presence in court, at the administrative hearing, or at a deposition is required by subpoena or other circumstance, and for which he is present, regardless of whether he actually testifies.
For the purposes of this provision, LSA-R.S. 13:3662 I states that "fire service personnel" includes "all persons employed or engaged full-time, part-time, or on a volunteer basis by municipalities or municipal fire departments, parishes or parish fire departments, or fire protection districts for fire fighting or fire prevention duties and services, including employees of the state fire marshal's office." [Emphasis added.]
This statutory provision addresses the appearance of a fire service person in his official capacity as a "witness," not as an expert witness. The compensation of expert witnesses, regardless of occupation, is set forth in LSA-R.S. 13:3666. Under LSA-R.S. 13:3666 A, only those witnesses called to testify in court as to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court. However, a witness who is qualified as an expert is not entitled to a fee if he merely gives testimony to facts and circumstances which could be stated by a knowledgeable lay witness. D'Angelo v. New Orleans Public Service, Inc., 405 So.2d 1262, 1271 (La.App. 4th Cir.), writ denied, 407 So.2d 748 (La.1981); Welton v. Falcon, 341 So.2d 564, 573 (La.App. 4th Cir.1976), writs denied, 342 So.2d 872 and 1109 (La.1977); State, Department of Highways v. Port Properties, Inc., 316 So.2d 749, 758 (La.App. 1st Cir.1975).
Factors to be considered by the trial court in setting expert witness fees include time spent testifying, in preparatory work for trial, and away from regular duties while waiting to testify, as well as the extent and nature of the work performed and the knowledge, attainments, and skill of the expert. Albin v. Illinois Central Gulf Railroad Company, 607 So.2d 844, 845 (La.App. 1st Cir. 1992). Generally, the amount and fixing of expert witness fees lies within the sound discretion of the trial court and will not be disturbed in an absence of an abuse of discretion. Williams v. City of Monroe, 27,065, p. 13 (La.App. 2nd Cir. 7/3/95); 658 So.2d 820, 832, writs denied, 95-1998 and 95-2017 (La.12/15/95); 664 So.2d 451 and 452; Durant v. State, Department of Transportation and Development, 93-1028, 93-1029, and 93-1030, p. 9 (La.App. 1st Cir. 4/8/94); 636 So.2d 1022, 1026, writ denied, 94-1654 (La. 10/7/94); 644 So.2d 637; Albin v. Illinois Central Gulf Railroad Company, 607 So.2d at 845; Thibaut v. Thibaut, 607 So.2d 587, 610 (La.App. 1st Cir.1992), writs denied, 612 So.2d 37, 38, and 101 (La.1993); Williams v. Harvey, 328 So.2d 901, 910 (La.App. 4th Cir.1976).
In the instant case, both LeBlanc and Thibodeaux were tendered and accepted by the court as expert witnesses. LeBlanc's testimony established that, on March 14, 1994, he had been chief of the Prairieville Volunteer Fire Department for approximately six years. In connection with his duties as chief, he was required to investigate residential fires and give opinions in reports regarding the cause of the fires. LeBlanc indicated that he had investigated approximately 300 fires to determine the cause and origin. Thibodeaux testified that he had been a member of the Prairieville Volunteer Fire Department for approximately nine to ten years and had served in the capacity of firefighter and captain. Thibodeaux indicated that he had worked at over 1000 fires and had in excess of 1000 hours of formal training in firefighting, including cause and origin. As captain, Thibodeaux had either led or participated in approximately thirty to forty *762 fire investigations, and in approximately "two dozen" of those, he had to determine the cause and origin.
The record indicates that the parties stipulated that the cause of the fire was a spark from the burning stump and expert testimony was not essential to establish the cause and origin of the fire. However, LeBlanc's testimony, which was based on his observations at the scene, his investigation and subsequent report, and his general knowledge and experience as an expert in fire cause and origin, was related to his expertise and was necessary to the trial court's determination of whether Mullins' recovery was barred by the "fireman's rule," i.e., whether Rougeou was grossly negligent in causing the fire. LeBlanc testified that, given the windy conditions, the location of the stump in proximity to the house, the existence of tar paper covering the house, and the glowing embers being left unattended, the house fire was substantially certain to occur. Furthermore, based on a stipulation, the parties agreed that if Thibodeaux were to testify, his testimony would be substantially the same as that of LeBlanc. Pursuant to that stipulation, the parties agreed that Thibodeaux would have given the same expert opinion that the house fire was substantially certain to result from the given conditions.
Based on an examination of the record, I conclude that there was no abuse of discretion by the trial court in determining that expert witness fees were proper and in setting each expert witness fee at $400.00. Thus, these fees should be assessed to defendant.

CONCLUSION
I submit that the majority opinion errs in misapplying the standard of review and that the judgment of the trial court should be affirmed. Therefore, for the above and foregoing reasons, I respectfully dissent.
NOTES
[1] The issue of what constitutes an "extraordinary" risk arose in the case of Chinigo v. Geismar Marine, Inc., 512 So.2d 487. Quoting from Comment, Negligence Actions by Police Officers and Firefighters: A Need for a Professional Rescuers Rule, 66 Cal.L.Rev. 585, 598-602 (1978), the Chinigo court, 512 So.2d at 491, described an "extraordinary" risk as:

one that deviates from the norm of risks encountered in a given community to the extent that the professional rescuer cannot fairly be said to have agreed to relieve citizens of responsibility for it. Risks may be extraordinary because the hazard is hidden or unknown, or because rescuers must remedy a risk that is beyond their training and experience.
These extraordinary risks could arise because the risk-generating object is itself extraordinary or because the object, while common in itself, is exceptionally hazardous because of its quantity or placement. For example, a reactive chemical such as potassium could present an extraordinary risk in any residence, regardless of the quantity. Fuel oil, on the other hand, would generally present an ordinary risk [if] it were stored in an exterior tank in reasonable quantity. The same fuel oil could also be extraordinary, however, if it were stored in excessive quantity or in an open container in a basement.
In Chinigo, a sheriff's deputy responding to a call that a tank truck was leaking a clear liquid onto the highway, became seriously ill when exposed to the liquid. The tank truck did not exhibit placards designating that it was transporting styrene monomer, a highly volatile, toxic chemical. In finding that the professional rescuer rule did not preclude the deputy's suit against the owner of the tank truck, this court found that the defendant "improperly handled a hazardous chemical in a wanton manner" and that the risk to which the deputy was exposed was "extraordinary and one which was beyond [his] training and experience ... to remedy." Chinigo v. Geismar Marine, Inc., 512 So.2d at 492.
Clearly, the risk at issue herein, a collapsing wall inside of a burning building, does not constitute an "extraordinary" risk of firefighting.
[2] At trial, Mullins introduced various photographs into evidence as Plaintiff's Exhibit 1. The photographs purportedly depict the stump and the area in the immediate vicinity of the stump. When the record was transmitted to this court, the exhibit was not included. An exhaustive search has been made for the exhibit, without avail. Therefore, this in globo exhibit is not available for review by this court.