832 So.2d 1004 (2002)
Donnie HOLLOWAY and Nancy Holloway, Plaintiff-Appellee,
v.
MIDLAND RISK INSURANCE COMPANY, et al, Defendant-Appellant,
Ouachita Parish Police Jury, Intervenor-Appellee.
No. 36262-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 2002.
Rehearing Denied December 5, 2002.
*1007 Charles G. Tutt, Jennifer P. McKay, for Appellant.
Daniel R. Street, for Appellee, Donnie Holloway and Nancy Holloway.
Thomas A. Woodley, for Appellee, International Association of Fire Fighters and Louisiana Professional Fire Fighters Association.
George M. Snellings IV, for Appellee/Intervenor, Ouachita Parish Police Jury.
Before NORRIS, WILLIAMS and CARAWAY, JJ.
WILLIAMS, Judge.
The defendants, Holmatro Inc. ("Holmatro") and Vanguard Insurance Company, appeal a judgment in favor of the plaintiffs, Donnie Holloway and Nancy Holloway. The jury found that Holmatro's product was defective and assessed defendants with 100% fault in causing the injuries to Donnie Holloway. The jury awarded plaintiffs total damages in the amount of $386,500. For the following reasons, we amend and affirm as amended.

FACTS
On September 18, 1997, Donnie Holloway, a firefighter with the Ouachita Parish Fire Department ("OPFD"), responded to the scene of a one-vehicle accident in Sterlington, Louisiana. A pickup truck had left the road and crashed into a tree, trapping the driver in the wreckage. The emergency workers were unable to manually remove the driver, Tywonia Wilson, from the damaged vehicle. When the Rescue One fire truck arrived at the scene, Holloway assisted another fireman, Marshall Daniels, with moving the hydraulic rescue equipment into place on the passenger side of the vehicle. A high-pressure hydraulic hose connected the pump to the rescue tool.
*1008 Holloway then stood behind Daniels as he operated the hydraulic ram, a tool used to push the dashboard forward and out of the way in an attempt to extricate the driver. When Daniels stopped the ram to check whether more space was needed, Holloway placed his right hand on the high-pressure hydraulic hose, which suddenly ruptured and blasted hydraulic fluid through his glove into the palm of his right hand. The injury caused pain and swelling in his hand. Holloway was transported to the North Monroe Hospital emergency room, where he was examined by Dr. Scott McClelland, who recommended immediate surgery. A short time later, Holloway underwent surgery to remove damaged tissue from his right hand. The incisions were left open to allow fluid to drain from the wound. Two days later, a second surgery was performed to join together tendons and nerves severed by the fluid. Holloway began physical therapy several weeks after his injury.
Subsequently, the plaintiffs, Donnie and Nancy Holloway, filed a petition for damages against the defendants, Wilson, her auto liability insurer, Midland Risk Insurance Company, the plaintiffs' UM insurer, State Farm Fire & Casualty Company, and the manufacturer of the hydraulic rescue equipment, Holmatro, Inc. and its parent company, Holmatro Industrial and Rescue Equipment a/k/a BV Holmatro. Wilson and State Farm were dismissed from the suit on an exception of no cause of action. See Holloway v. Midland Risk, 33,026 (La.App.2d Cir.5/15/00), 759 So.2d 309. After completion of the evidence, BV Holmatro was dismissed upon defendant's motion for directed verdict.
In their petition, plaintiffs alleged that Holmatro was liable for damages caused by its defective rescue equipment and for failure to warn under the Louisiana Products Liability Act (LPLA). Plaintiffs also urged that Holmatro's handling of the hoses constituted spoliation of evidence. The Ouachita Parish Police Jury intervened seeking recovery of workers' compensation and medical benefits paid. Holmatro filed a motion for summary judgment and a motion in limine to exclude evidence related to the spoliation claim. Both motions were denied.
After a trial, the jury returned a verdict assessing Holmatro with 100% fault in causing Holloway's injury. The jury awarded him damages of $275,000 for pain and suffering, $16,000 for lost wages, $4,000 in future lost wages and $66,000 in medical expenses. It also awarded Nancy Holloway $25,000 for loss of consortium. The poll of the jury showed that nine of the jurors agreed with the verdict. The trial court entered judgment in conformity with the verdict. Holmatro appeals the judgment. On appeal, this court granted plaintiffs' motions to supplement the record with the transcript of the jury polling and to strike from the record the juror "working copies" of the verdict form.

DISCUSSION
Holmatro contends the trial court erred in denying its motion for summary judgment. Holmatro argues that the application of the professional rescuer's doctrine bars recovery by the plaintiffs.
Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966. The mover has the burden of establishing the absence of a genuine issue of material fact. Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources v. Willamette Industries, *1009 Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477.
The professional rescuer's doctrine, or "fireman's rule," provides that a professional rescuer injured in the performance of his duties "assumes the risk" of such injury and is not entitled to recover damages. Mullins v. State Farm, 96-0629 (La.App. 1st Cir.6/27/97), 697 So.2d 750. More precisely, the rule is considered in determining the risks included within the scope of a defendant's duty and to whom the duty is owed. A defendant's ordinary negligence or breach of duty does not encompass the risk of injury to a fireman responding in the line of duty to a situation created by such negligence. Worley v. Winston, 550 So.2d 694 (La.App. 2d Cir. 1989). Thus, the fireman's rule generally arises in claims by rescuers against the person who was responsible for starting the fire itself or prompting the need for rescue. See Holloway, supra; Worley, supra; Mullins, supra.
Here, unlike the situations in the above-cited cases, the plaintiffs are not seeking recovery against the person who created the emergency situation, but seek to recover from the manufacturer of the product which failed and injured Holloway during the performance of his duties. Under the circumstances of the present case, defendants failed to show that the professional rescuer's doctrine is applicable so as to entitle them to judgment as a matter of law. Consequently, the trial court did not err in denying summary judgment. The assignment of error lacks merit.
Spoliation Issue
In two assignments of error, Holmatro contends the trial court erred in its evidentiary ruling and instruction to the jury on the issue of spoliation. In civil litigation, the theory of spoliation of evidence refers to an intentional destruction of evidence for the purpose of depriving the opposing parties of its use. Smith v. Jitney Jungle, 35,100 (La.App.2d Cir. 12/5/01), 802 So.2d 988; Hooker v. Super Products Corp., 98-1107 (La.App. 5th Cir.6/30/99), 751 So.2d 889.
A litigant's failure to produce evidence within his reach raises a presumption that the evidence would have been detrimental to his case. However, this presumption is not applicable when the failure to produce the evidence is adequately explained. Randolph v. General Motors Corp., 93-1983 (La.App. 1st Cir.11/10/94), 646 So.2d 1019.
All relevant evidence is admissible unless otherwise provided by law. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. LSA-C.E. arts. 401-403. Generally, the trial court is accorded discretion concerning the admission or exclusion of evidence. A trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La. App. 4th Cir.5/17/94), 638 So.2d 306.
Scott Saterfiel, an OPFD mechanic, testified that the day after the accident he removed the damaged hose from the reel, attached a tag, rolled up the hose and placed it in a storage area of the garage. Saterfiel stated that he observed a rupture at the end of the hose. Saterfiel testified that the hose remained in his shop until approximately December 1997, when Len Rush, a distributer of Holmatro rescue equipment, picked up the hose. Saterfiel showed the damaged area to Rush, who placed the hose into his truck trailer and departed.
Saterfiel could not say whether or not the hose in court was the same hose given to Rush, but testified that the hose was not *1010 in the same condition as it had been when delivered to Rush. Saterfiel stated that the hose given to Rush did not have tape on the end and did not have similar damage.
Len Rush testified that Holmatro's president asked him to retrieve the damaged hose from the OPFD. Rush stated that he picked up a hose which Saterfiel identified as the one involved in the accident. Rush testified that he briefly looked at the hose and observed a rupture near its end. Rush stated that the hose in court looked like the hose that he had obtained from Saterfiel and shipped to Holmatro.
Marshall Daniels testified that he operated the hydraulic ram at the accident scene and was assisted by Holloway. Daniels stated that the hose in court did not appear to be the hose he had used at the time of the accident. However, Daniels testified that if the hose was the same, then it was not in the same condition. OPFD firemen Dennis Ford and David Trichell testified that they had worked on Rescue One and had inspected the hydraulic rescue equipment. Both Ford and Trichell stated that the hose in court was damaged and that a hose in such condition would not have been used on Rescue One. Holloway testified that the hose used at the accident scene did not have tape attached and did not look like the hose displayed in court. He could not further describe the condition of the accident hose.
A Sergio, a technical training specialist with Holmatro, testified that he, Eric Marquess and Barry Whited participated in the initial inspection of the hose involved in the accident. Sergio stated that they stretched out the hose, took measurements and discovered a rupture at the end of the hose.
Eric Marquess, an engineer at Holmatro, testified that in July 1998, he inspected a hose received from Rush at Holmatro's facility in Maryland with Sergio, Whited and William Swain, president of Holmatro. Marquess stated that they did not detect a rupture in the hose during this initial visual inspection. Marquess explained that at the time, they did not know where the hose had ruptured. He testified that a subsequent pressure test of the hose demonstrated a leak or rupture near the coupling on the hose.
William Swain stated that Holmatro received the accident hose from Rush in July 1998 and that he made a videotape of the hose during the inspection by Sergio, Marquess and Whited. Swain testified that the red hose presented in court and identified as exhibit D-20 appeared to be in the same condition as when it was received from Rush. Swain acknowledged that he did not contact the plaintiffs' attorney or OPFD to arrange a joint inspection of the hose involved in the accident.
The testimony indicates that OPFD maintained control of the ruptured hose for several months following the accident, from September 1997 until approximately December 1997, when Rush picked up the hose. Rush testified that he kept the hose for one week to ten days before shipping the hose to Holmatro's facility in Maryland. However, Marquess and Swain testified that Holmatro did not receive the hose until July 1998. The testimony does not explain where or under what conditions the hose was kept during that interim period.
The trial court instructed the jury regarding the adverse presumption as follows:
Where it is proven that a party has intentionally destroyed evidence for the purpose of depriving the opposing party of its use, an adverse presumption applies that the evidence would have been detrimental to the destroying party's case.
Contrary to the defendants' assertion in their brief, the jury charge did not suggest *1011 there was proof of intentional destruction of evidence, but correctly stated that an adverse presumption applies "[w]here it is proven" that evidence was intentionally destroyed. The record shows that Holmatro intentionally acted to gain control of the hose and did not document the condition of the hose at the time it was retrieved by Rush. Additionally, Holmatro and its agents failed to provide information concerning the custodial management of the hose during the seven-month period between Rush's retrieval of the hose and its videotaping by Holmatro in July 1998.
Even if we were to assume the jury instruction was error, the defendants were not prejudiced, since the jury was able to view the condition of the hose introduced into evidence, consider the circumstances surrounding the handling of the hose by both Holmatro and OPFD and assess the credibility of witnesses concerning the question of whether or not the hose presented in court was the same hose and in the same condition as the one used at the time of the accident. After reviewing the record, we cannot say that the court's delivery of the instruction was so misleading as to preclude the jury from reaching a verdict based on the law and the facts. The assignments of error lack merit.
Product Liability
Holmatro contends the trial court erred in denying its motion for directed verdict on the issue of whether the hydraulic hose was defective. A defendant who introduces evidence after the denial of its motion for directed verdict is deemed to have abandoned the motion and the evidence in the case is judged on the entirety of the record. Jackson v. Quick, 543 So.2d 552 (La.App. 4th Cir.), writ denied, 546 So.2d 1219 (La.1989); Dunaway v. Rester Refrigeration Service Inc., 428 So.2d 1064 (La.App. 1st Cir.1983). Here, the record shows that Holmatro did not elect to rest on its motion, but exercised its right to present evidence after the verdict was denied. Thus, the motion is deemed abandoned. The assigned error lacks merit.
Holmatro contends there was insufficient evidence to support the jury's verdict that the hose was defective. The Louisiana Products Liability Act (LPLA) provides that the manufacturer of a product shall be liable to a claimant for damage caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use. LSA-R.S. 9:2800.54.
Under the LPLA, liability may be imposed on a manufacturer when a product is found to be unreasonably dangerous in one of four ways: construction or composition, design, inadequate warning or nonconformity with an express warranty. Young v. Logue, 94-0585 (La.App. 4th Cir.5/16/95), 660 So.2d 32. A product is unreasonably dangerous in design if, at the time it left the manufacturer's control, there existed an alternative design that was capable of preventing the claimant's damage and the likelihood and gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design and any adverse effect on the product's utility. LSA-R.S. 9:2800.56; Ashley v. General Motors Corp., 27,851 (La. App.2d Cir.1/24/96), 666 So.2d 1320.
In the present case, the hydraulic hose at issue consists of a flexible nylon inner tube which contained the hydraulic fluid. This tube is surrounded by two layers of wire wound in opposite directions. A steel braid wraps around these layers providing the major structural strength of the hose. The metal braid is covered by an outer plastic jacket which protects the braid from external damage by chemicals, abrasions and sunlight.
The plaintiffs' mechanical engineering expert, Dr. Leighton Sissom, testified that *1012 during use, the flexible hydraulic hose undergoes repetitive bending, or flexion, near the area where the hose's rigid fitting or coupling connects to the hand-held rescue tool. Sissom stated that over time, this process of flexing causes the wound metal wires and braid to rub against each other and wear thinner, gradually breaking down the structural integrity of the hose.
Sissom described a bend restrictor as a metal coil or plastic device that fits over the end of a hose crimped into a steel fitting. The bend restrictor introduced into evidence by the plaintiffs was a flexible metal spiral device. Sissom explained that a bend restrictor did not prevent a hose from bending, but limited the extent of the flexing. A primary purpose of the bend restrictor is to prevent kinking, defined as a permanent deformation of a hose caused when the hose is bent beyond the specified bend radius such that there remains a visible bend in the hose. Sissom stated that the minimum bend radius on the Holmatro hose was 3½ inches, meaning that if the hose was bent beyond that range, there is a potential for damage to the hose. The bend restrictor also protects against damage from external forces, such as a person stepping on a hose.
Sissom testified that bend restrictors are relatively simple devices that were available to hydraulic hose manufacturers in 1992. Sissom was not aware of any industry standards or government regulations that were applicable to the manufacture of hydraulic rescue equipment at the time the Holmatro hose was sold to OPFD, but he stated that even in the absence of such standards, user safety remained a primary concern. Sissom was asked to assume the facts that a hose ruptured near the fitting after being used properly from 1992 until September 1997, and that the hose was not kinked in the area of failure. Sissom opined that under those facts, more probably than not the hose failure was caused by repetitive flexing where the shoulder of the fitting joined the hose, which was not protected by a bend restrictor. Sissom concluded that the design defect of failing to incorporate a bend restrictor on the hose caused or contributed to Holloway's injury.
Sissom acknowledged that flexion of the hose would still happen with a bend restrictor in place, but stated that the weakening of the hose structure would take a longer period of time and greater force to occur. However, Sissom did not specify how much more time or force would be required to damage the hose with a bend restrictor than without.
The defendants' mechanical engineering expert, John Hill, testified that fatigue was not a likely factor in the failure of the hose, since the hose's operating pressure of 10,500 psi did not exceed 50% of the hose's burst pressure of 27,000 psi. Hill suspected that the hose rupture was due to a one-time overload failure, which probably occurred when Daniels was using the hydraulic cutter in an attempt to remove the vehicle's brake pedal. Hill opined that the cutter's contact with the metal of the brake pedal caused the tool to "bounce out" and placed an excessive load onto the hose. However, Hill did not know if the ruptured hose had been connected to the cutter prior to the accident.
Hill testified that his testing showed that bending the Holmatro hose to the minimum bend radius required seven pounds of pressure with the bend restrictor, a slight difference from the six pounds of pressure required without the device. Hill acknowledged that the bend restrictor provides a very narrow window of protection against bending and "marginally" reduces flexing at the area where the crimped hose joins the fitting. Hill testified that the bend restrictor would not prevent fatigue, but might "increase the *1013 life of the hose slightly." Hill stated that hose failure due to fatigue was possible and agreed that the bend restrictor contributes to the structural integrity of the hose.
William Fisher, an employee of Parker Hannifin, a manufacturer of hydraulic hose components, testified that such hoses are by nature perishable, they wear out and have a finite life. Fisher stated that bend restrictors provide added resistance to overbending of hoses and were available at the time OPFD purchased hoses from Holmatro in 1992. Fisher testified that in the rescue situation application, the area near the end of the hose adjacent to the crimped fitting is a point of high stress. Fisher acknowledged that a bend restrictor minimizes flexion of the hose at that point.
Testimony indicated that the expected life span of the Holmatro high-pressure hose was approximately eight years. At the time of the accident, the OPFD had used the hose for five years. Sissom testified that the bend restrictor would have delayed the normal wear resulting from the repetitive flexing of the hose during use. Additionally, Hill acknowledged that the bend restrictor could slightly increase the life of the hose. Sissom did not quantify the duration of the period of the hose's prolonged life due to the bend restrictor. However, the jury could reasonably have found that the use of a bend restrictor throughout the entire period of the hose's service more probably than not would have prevented Holloway's injury by preserving the integrity of the hose through its normal life expectancy.
Further, the evidence presented supports a finding that the gravity of the potential damage resulting from a rupture of the high-pressure hydraulic hose significantly outweighed the relatively minimal burden on Holmatro of adopting the alternative design incorporating the bend restrictors.
The jury heard the conflicting expert testimony and weighed the credibility of the witnesses. The parties offered competing theories of the meaning of the evidence. After reviewing the entire record, we cannot say the jury was clearly wrong in finding that the Holmatro hydraulic hose was unreasonably dangerous because an alternative design was available that would have been capable of preventing Holloway's injury. The assignment of error lacks merit.
Allocation of Fault
Holmatro contends the jury erred in finding that OPFD was without fault in causing Holloway's injury. Holmatro argues that OPFD selected the rescue equipment with knowledge of the risks involved with high-pressure hoses and of the availability of bend restrictors.
Allocation of fault is a factual determination subject to the manifest error rule. Morris v. USAA, 32,528 (La. App.2d Cir.2/18/00), 756 So.2d 549. Comparative fault is applicable in product liability cases. Moore v. Chrysler Corp., 596 So.2d 225 (La.App. 2d Cir.1992).
Here, OPFD Chief Don Nugent testified that when OPFD was making the decision to purchase rescue equipment in 1992, the bend restrictors were not mentioned by Holmatro. Chief Nugent stated that OPFD adopted the rescue tool specifications supplied by Holmatro. Nugent testified that he first learned of bend restrictors after OPFD replaced all of its hoses following Holloway's injury. Holmatro does not show how the OPFD was at fault for relying on the information provided by Holmatro. Based upon the testimony, we cannot say the jury was clearly wrong in declining to allocate fault to the *1014 OPFD. The assignment of error lacks merit.
Holmatro contends the jury erred in finding that Holloway was not at fault in causing the accident. Holmatro argues that Holloway contributed to causing his injury by carelessly placing his hand on the hydraulic hose.
Daniels testified that firefighters come into contact with the hoses almost every time the hydraulic rescue tools are used. Trichell testified that hoses must be held or moved by hand to facilitate operation of the rescue tools in confined spaces. Holloway testified that he placed his hand on the hose to get a sense of its location during a pause in the operation of the ram. The testimony did not indicate that Holloway twisted or pulled the hose prior to the rupture. After reviewing the record, we cannot say the jury was clearly wrong in finding that Holloway was without fault in merely placing his hand on the hose. The assignment of error lacks merit.
Damages
Holmatro contends the jury's awards of $275,000 to Donnie Holloway for pain and suffering and $25,000 to Nancy Holloway for loss of consortium are excessive. Before the trial court's damage award may be disturbed, the record must clearly show that the factfinder abused its broad discretion in making the award. Jackson v. A.L. & W Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir.1992). The finding of an abuse of much discretion must be based on the particular injuries sustained and their effect on the particular injured person. After a determination that an award is an abuse of discretion, the appellate court may lower an excessive award to the highest amount or raise an inadequate award to the lowest point reasonably within the factfinder's discretion. Jackson, supra.
In the present case, the evidence shows that Holloway's injection injury to his right hand was extremely painful. The blast of hydraulic fluid completely severed a flexor tendon in his right index finger. Holloway underwent emergency surgery on the day of the accident, requiring large incisions on both sides of his hand. Dr. McClelland removed damaged tissue, drained hydraulic fluid and left the wounds open for further draining. Two days later, Dr. McClelland performed another surgery to remove tissue. After this surgery, the wound on the back of the hand was closed but the wound in the palm could not be closed due to swelling. On September 22, 1997, a third surgery was performed to remove remaining damaged tissue and close both wounds. Dr. McClelland informed Holloway that the injury was severe and that his hand would not return to its normal condition.
Holloway participated in physical therapy for one-hour sessions five days per week. His condition gradually improved and in December 1997, Holloway began a work conditioning program involving more aggressive therapy to improve the function of his right hand. Holloway returned to regular duty as a fireman in February 1998, approximately five months after his injury. In April 1998, Holloway began to develop swollen areas on his right hand. Additional surgery was required to drain these abscesses, keeping Holloway off of work from May to August 1998.
Holloway testified that at the time of trial, he continued to experience pain on a daily basis with numbness, a tingling sensation in his fingers and tremors of his hand. Holloway's right hand is permanently scarred and impaired. Dr. McClelland opined that Holloway's degree of function and range of motion have been reduced as a result of the injury and that his condition is permanent.
Based upon the testimony and the medical evidence in the record, and considering *1015 the particular persisting effects of Holloway's injury to his right hand, we cannot say the jury's award of $275,000 for pain and suffering is beyond the amount reasonably within the factfinder's broad discretion.
A claim for loss of consortium includes the loss of love and affection, companionship and services. The plaintiff has the burden of proving a definite loss. Quinn v. Wal-Mart Stores Inc., 34,280 (La.App.2d Cir.12/6/00), 774 So.2d 1093.
Here, Nancy Holloway testified that she was expecting a baby when her husband was injured. Nancy stated that while Donnie was recovering, she drove him to his doctor's appointments and helped him to shave, get dressed and cut his food. After the surgeries, Holloway was unable to help his wife with the household duties, including laundry and mowing the lawn. Nancy acknowledged that her husband's injury did not cause long-term damage to the marriage. Don Holloway testified that his ordeal had strengthened the relationship with his wife.
Based upon the testimony presented, we must conclude that the jury's award of $25,000 for loss of consortium is excessive. Considering the evidence of the effect of Holloway's injury on the relationship with his wife, we find that an award of $10,000 is the highest amount reasonably within the discretion of the factfinder under the circumstances of this case. The judgment shall be amended accordingly.

CONCLUSION
For the foregoing reasons, the district court's judgment is amended and the loss of consortium award to Nancy Holloway is hereby reduced to $10,000. In all other respects, the judgment is affirmed. Costs of this appeal are assessed to the appellants, Holmatro, Inc. and Vanguard Insurance Company.
AMENDED AND AFFIRMED AS AMENDED.
CARAWAY, J., dissenting.
I respectfully dissent from the majority's conclusion that a design defect was proven by the plaintiffs in this case. The opinion of the plaintiffs' expert cited "repetitive flexing" as the cause of the rupture of the hose at the point where the hose meets the metal fitting which is employed to connect the hand-held rescue tool. The expert was asked to assume that there was no kink in the hose at that point where the end of the hose enters the fitting. Indeed, the evidence is undisputed that there was no kink or prior abusive bend of the hose at that location. According to plaintiffs' expert, the steel braid wrap would have just worn out and been broken by metal fatigue at that crucial point where the hose and the metal fitting meet.
The hose had been in use for five years. The repetitive movement and use of the tool necessarily concentrated stress on the hose at the critical juncture where the hose was crimped to enter the fitting. The issue presented under La. R.S. 9:2800.56(2) is whether the bend restrictor was shown by the evidence to be an alternative design that, more probable than not, "was capable of preventing the claimant's damage."
The eight-inch piece of the bend restrictor in the record looks like a spring. It is a metal coil with an inside diameter of approximately three-fourths of an inch through which the hose would run. When held horizontally on one end, the weight of the eight-inch spring without the hose causes the other end of the restrictor to sag downward. In other words, it is a very flexible spring. When bent all the way around into a circle, the eight-inch exhibit demonstrates its intended advantage of maintaining circularity of itself *1016 and the hose, thus preventing an abusive bend or kink in the hose. On the other hand, the bend or kink restrictor does not prevent "repetitive flexing." Such flexion of the hose was its essential function, particularly at the end of the hose where it was connected to the rescue tool.
If this case involved a rupture at a place along the hose where a kink existed, the issue of the propriety of the alternative design of the restrictor to prevent such a kink would be much closer. Instead, "repetitive flexing," which caused metal fatigue in the steel braid wrap of the hose, was a risk related to the long history of use of the hose and the rescue tool which the flexible protective spring in question would not prevent. I, therefore, believe the finding of a design defect is unsupported by the record and presents manifest error.

APPLICATION FOR REHEARING
Before NORRIS, WILLIAMS STEWART, CARAWAY, and DREW, JJ.
Rehearing denied.