914 So.2d 62 (2005)
GREENHEAD GUN CLUB, L.L.C., Plaintiff-Appellant
v.
CITY OF SHREVEPORT and Wicker Construction, Inc., Defendants-Appellees.
No. 40,045-CA.
Court of Appeal of Louisiana, Second Circuit.
October 12, 2005.
*64 Jeffrey Lee Little, Shreveport, for Appellant, Greenhead Gun Club, L.L.C.
Cook, Yancey, King & Galloway, by Sidney E. Cook, Jr., Shreveport, for Appellee, City of Shreveport.
Lugenguhl, Wheaton, Peck, Rankin & Hubbard, by Ralph S. Hubbard III, Seth Andrew Schmeeckle, New Orleans, for Appellee, *65 The Travelers Indemnity Company of Illinois.
Wilkinson, Carmody & Gilliam, by Mark Ellis Gilliam, Shreveport, for Appellee, Wicker Construction, Inc.
Before GASKINS, DREW and LOLLEY, JJ.
DREW, J.
Greenhead Gun Club ("Greenhead") appeals a judgment awarding it $7,500 for damages it sustained when the City of Shreveport pumped wastewater into a crawfish farm owned by the club.
We amend the award to add the costs incurred by Greenhead to test the water, and as amended, the judgment is affirmed.

FACTS
On March 1, 2001, storm water inundated Shreveport's North Regional Wastewater Treatment Plant, which is built inside a levee system. More water entered the plant than it was able to treat. In order to slow the inflow of water, metal plates were placed over manhole covers. Nevertheless, water continued to rise in the plant, endangering its electrical motors and control panels. If the plant could not function, then sewage would back up into homes and spill over into waterways. Pumps were placed at the treatment plant to remove the water, but the water did not recede.
The next day, a decision was made to place pumps at various manholes near the plant. One of these manholes, which was under several feet of water, was in a right-of-way along Nash Street near Greenhead's property. Shreveport contracted with Wicker Construction to set up the pumps and to monitor and operate them. Two six-inch pumps moved water from around the manhole, across the road, and into Matt Lake on the other side of the road. This began on March 2. Unfortunately for Greenhead, the wastewater eventually made its way across a levee separating Matt Lake from a 200-acre wetland area used for crawfish farming.
John James is the manager of Greenhead. In early March, he was in Baton Rouge for business reasons with the intent to begin harvesting the crawfish upon his return to Shreveport. When James approached Greenhead's property on March 8, he noticed that his gate was open and the gate posts were spread out. Despite contact information being posted on a sign near the gate, nobody involved in the pumping had contacted James about what was being done. As James continued driving, he discovered the two pumps on axles, a fuel tank, and a backhoe. James, who is a fireman, thought the unattended pumps were ten-inch pumps.
When three individuals drove up in a Wicker truck and asked James what he was doing on the property, James explained to them that it was his property and he wanted to know what was happening. When informed of what the pumps were doing, James told them to shut the pumps down, which was done after a supervisor was contacted.
James testified that after the pumps were turned off, he took a water sample and brought it to a Shreveport treatment plant, but he was told that his sample could not be tested because it was not sterile. A city employee tested the water in Matt Lake the next day. James stated that when he asked the person taking the samples when he could get the results, she responded that it would be two to three days. James added that when he contacted the city three days later, he was told that the test results would not be made available to him. At that point James contacted his attorney.
*66 On March 15, 2001, a letter was written to the city by Greenhead's attorney seeking Shreveport's entire file concerning the pumping. James subsequently received a lab summary report from the city. James asserted that the lab summary report that he received was not satisfactory to him, as he wanted something more complete that he could show to his buyers. Accordingly, James contracted for testing to be done by a lab. Agricultural Agent Gil Barker assisted in taking the samples on March 19. The test cost $136, and showed there was nothing abnormal in the water. James began selling crawfish from the property again on April 2.
Greenhead filed suit against Shreveport, Wicker Construction and its insurer, Travelers Indemnity Company of Illinois, asserting that defendants' actions:
 caused damage to Greenhead's gate poles and levee;
 prevented Greenhead from receiving 30 loads of fill dirt valued at approximately $2,250;
 caused Greenhead to lose income by preventing Greenhead from harvesting or selling crawfish until it assessed the effect the pumping had on the crawfish; and
 caused future damage to Greenhead's crop as well as damage to Greenhead's business and product reputation.
Greenhead also sought damages for what it avers was a violation of the Freedom of Information Act by Shreveport.
A bench trial was held in this matter over two days in August of 2004. In extensive reasons for judgment, the trial court concluded:
 There was insufficient evidence that Greenhead owned the gate, and inadequate evidence of the cost of resetting the poles. Replacement of the poles was apparently unnecessary.
 In spite of the emergency situation, it was a violation of the defendants' due care not to contact James prior to commencing the pumping into Matt Lake. Under the circumstances, diverting the water into Matt Lake was a continuing trespass.
 There was inadequate evidence to conclude there was sewage pumped into Matt Lake. More probably it was storm water.
 Although the pumping caused James to miss several harvesting cycles, James did not take steps to promptly mitigate damages by obtaining his own testing of the water more expediently. Accordingly, it was probable that he would have been able to harvest the crawfish sooner.
 Greenhead was only entitled to reasonable net proceeds attributable to the planned first harvest cycle set from March 8 to March 10, 2001.
 There was insufficient evidence to conclude that the pumping of water into Matt Lake by six-inch pumps caused the levee to be eroded. It was just as likely caused by flooding to the area from the volume of rain and watershed of the lake.
 There was insufficient evidence that defendants' actions caused the loss of dirt as it is not sufficiently clear why the loads of dirt were not delivered.
 There was no loss of business reputation.
 The Freedom of Information Act claim lacks merit. The only information not provided were measurements and data not related to the claim.
After the parties briefed the issue of damages, the court concluded that Greenhead was entitled to damages of $7,500 associated with the first harvest cycle that it missed. Greenhead appeals.

*67 DISCUSSION
The court benefitted from the testimony of several witnesses who are very knowledgeable about the various aspects of crawfish farming. Dr. Jay Huner, Director of the Crawfish Research Center at the University of Louisiana-Lafayette, was accepted as an expert in all aspects of crawfish, including development of crawfish ponds, harvesting of crawfish, and crawfish habitats. Dr. Huner explained the various effects that water temperature has upon crawfish.[1]
In preparation for his testimony, Dr. Huner reviewed James's logbook and Shreveport weather records.[2] Dr. Huner believed that there was basically no crawfish movement in Greenhead's pond in February of 2001. Dr. Huner opined that based upon the air temperature records, Greenhead would not have obtained meaningful crawfish production from its pond during the first 20 days of March of 2001. Dr. Huner noted that the smaller, younger crawfish are not available for harvesting during the colder periods because of their size, but as the temperature warms, they can quickly go through two and three molts in as little as ten days. Any crawfish that were not caught in March would still be available in April. Dr. Huner's opinion was that the pumping activity, and the resulting delay in harvesting because of James's concerns about contamination, had no meaningful effect on Greenhead's income from crawfish in March of 2001.[3]
Dr. Greg Lutz, who has a Ph.D. in Wildlife and Fisheries Science, is an aquaculture specialist at the LSU Agricultural Center. Dr. Lutz would have recommended that James begin harvesting in 2001 as soon as he had enough crawfish in the traps to economically justify the effort, because each crawfish harvested makes room for the smaller crawfish to grow. Dr. Lutz disagreed with those who wait until April to begin harvesting.
Dr. Lutz testified that if the density of crawfish in a pond is too high, the crawfish will stop growing, which will cause the crawfish to be shorter when they reach a mature stage than they otherwise would be. This will happen regardless of what is done for the crawfish, even if enough food is available.
Dr. Huner also testified that if the larger crawfish are not harvested regularly, then this will affect the ability of the smaller crawfish to grow. A pond that is not harvested regularly will have a stunting problem. However, Dr. Huner disagreed with Dr. Lutz's position that if the big crawfish are not harvested, then the smaller ones will not grow to a more marketable size.
*68 Dr. Lutz testified that when James raised the issue of an overcrowded pond and whether he needed to harvest the crawfish after discovering the pumps, Dr. Lutz believed that his recommendation was for James to harvest the crawfish even if he could not sell them in order to keep them from stacking up in the pond. However, Dr. Lutz admitted that he never really expected James to harvest the crawfish and just dump them.
It was remarked by Dr. Lutz that the effect of not harvesting enough crawfish may not be felt until the next crawfish season. He thought that a three-week delay in harvesting, with the first harvesting done in early April, would probably contribute to a stunting problem the next season. Dr. Lutz admitted that if James had harvested the crawfish while awaiting the test results, then he would have eliminated the potential stunting problem.
Dr. Huner was critical of James's management of the crawfish farm. For instance, Dr. Huner noted that Greenhead needed approximately 4,000 traps in order to properly harvest the crawfish.[4] Dr. Huner believed that the logbook suggested that James's pond was overpopulated, which he felt could have been caused by not having enough traps. Because the nature of Greenhead's pond presented access problems, Dr. Huner thought that James could not adequately trap the pond since James could only put out as many traps as he could access.[5] Dr. Huner stated that even if James had 4,000 traps, he suspected they were not equally divided across the entire surface of the pond. James testified that when he was in Baton Rouge in early March 2001, he had between 3,000 to 4,000 traps in position on his property.[6]
Ronald Christ is a biologist in the aquatic and fish division of the Louisiana Department of Wildlife and Fisheries. He was accepted as an expert in pond construction and wild crawfish production and fishing. Mr. Christ testified that even though crawfish that were not harvested remained in the pond, those crawfish were eating food that other crawfish would have used. This strain on the food supply would inhibit the ability of smaller crawfish to grow to a marketable size. Mr. Christ stated that because Greenhead's pond is shallow, he expected the water in the pond to be warmer than nearby Cross Lake.[7]
Accepted into evidence was the affidavit of Gil Barker, an Area Agricultural Agent for 10 years who was familiar with crawfish production in Northwest Louisiana. He stated that: (1) he was familiar with and had personal knowledge of James's crawfish operation developed from numerous visits to the pond to check conditions, water temperature, and rate of growth in preparation for harvest; (2) prior to the dumping of sewage on the property, it was determined that the crawfish were of marketable size and conditions were favorable for harvest; and (3) but for the dumping of the sewage, James would have been able to harvest crawfish.

Mitigation of Damages
Greenhead argues on appeal that the trial court erred in finding that it failed *69 to mitigate damages, and in finding that Greenhead was not entitled to damages for missing three four-day harvest cycles, which it alleges were missed while awaiting test results.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. Department of Public Safety & Corrections, 01-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989).
To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
An injured party has a duty to mitigate his damages. Aisole v. Dean, 574 So.2d 1248 (La.1991); Sepulvado v. Turner, 37,912 (La.App.2d Cir.12/10/03), 862 So.2d 457. The victim has an affirmative responsibility to make every reasonable effort to mitigate damages, but the care and diligence required of him is the same as that which would be used by a man of ordinary prudence under like circumstances. Id.
The trial court stated in its reasons for judgment that there was inadequate evidence to conclude there was sewage pumped into Matt Lake, and that more probably it was storm water. This was somewhat contradicted by the testimony of James Wyche, the Environmental Affairs Manager of Shreveport's Department of Operational Services.[8] Wyche noted that the level of fecal coliform in the water was lower than expected from a raw sewage discharge, which he attributed to the volume of rainwater that was in the sewer system.[9] In addition, Shreveport had Wicker run a chlorine drip into the pumped water in order to kill bacteria. Although the sewage may have been diluted by copious amounts of rainwater, there was still a component of sewage in the water that was being pumped into Matt Lake. Nevertheless, an appeal lies from the judgment itself, not the reasons for judgment. Kirkham v. Pumphrey, 34,349 (La.App.2d Cir.12/20/00), 775 So.2d 634, writ denied, 2001-201 (La.3/30/01), 788 So.2d 1191.
It is obvious that James was well advised to delay marketing his crawfish until he received test results. Although Dr. Lutz did not think that the sewage would actually harm the crawfish, he advised James to seek testing for fecal coliform before he attempted to sell his crawfish. Dr. Lutz was concerned about cross contamination from human pathogens. When James called Mr. Christ after discovering the pumps, Mr. Christ told James to be concerned about fecal coliform, and he advised James to delay selling crawfish until he knew what had been pumped into the pond. Barker told James not to sell crawfish *70 until he obtained satisfactory fecal coliform tests and bacteria counts.
Dr. Huner thought it was prudent for James not to sell crawfish until he determined the extent of the contamination, although Dr. Huner would have immediately tried to find out if there was any contamination. Dr. Huner thought that the test summary report initially received from Shreveport was just as informative as the actual lab results because it would alert James to any problems. Dr. Huner added that natural fecal coliform is in all untreated water, and he does not consider fecal coliform to be a toxic substance.
According to Wyche, samples for testing were taken at two locations in order to monitor the water being pumped from the manhole along Nash Street. He recalled that the sampling was done during the week after the diversion took place, and then a couple of weeks later. The test results summary reflects that samples were taken from two locations in Matt Lake on March 9 and March 23.
James testified that when a Shreveport representative arrived to perform the testing on March 9, she told him that she had been testing the water all week. He saw her test inside the sewer main and at a location in Matt Lake that was 150 yards away from the discharge point. He never asked the city to test the water in the crawfish pond, although he later tested this water when doing his own testing. James testified that he never received results from the city for the testing done the week prior to March 9 or from the sample he saw taken at the sewer main.
The results from both the city's testing and Greenhead's testing did not show anything abnormal. Because James was concerned enough about the water quality to delay harvesting, he should have acted with reasonable prudence in acquiring his own test results as soon as possible. Had he done so, he would have been able to commence harvesting much earlier. We note that Greenhead's own test results were completed on March 23, yet harvesting did not commence until April. Accordingly, the trial court was not clearly wrong in finding that Greenhead was only entitled to damages for missing one cycle of crawfish farming. We recognize that the trial court failed to account for the cost incurred by Greenhead in contracting for its own testing. The damages awarded to Greenhead are amended to reflect the added amount of $136, the cost of the testing.

Amount of Damages
Greenhead next argues that the trial court erred in calculating the damages from the missed cycle as $7,500.
Estimating the quantity of crawfish that would have been harvested is difficult to do with certainty. Dr. Lutz testified that there is no reliable method of projecting an anticipated yield from a crawfish harvest. Dr. Huner regarded it as pure speculation to attempt a projection of Greenhead's yield per trap in March of 2001 in the absence of recorded data.
Dr. Lutz believed that March, April, and May are probably the prime months for harvesting crawfish in North Louisiana. James reported in his logbook that on April 1, 2001, he caught one pound per trap from 20 traps and that the water temperature was 64°. Dr. Huner suspected that there was fairly good crawfish activity on that date. Accordingly, he believed that James would have caught substantially less than one pound per trap in March, when the water temperatures were lower. Dr. Huner estimated that even when the water temperature was below 55°, it was still possible for James to average 1/4 of a pound of crawfish in unbaited *71 traps, although he thought that was the best that James could have done.
Mr. Christ estimated that if the water temperature in March of 2001 had been 55°, James would have caught ½ to 1 pound in some traps, with possibly 1½ to 2 pounds in a trap in direct sunlight where the water might be a few degrees warmer. James, who tested about 20 traps on March 23, estimated that the approximately 15 test traps that were not turned over yielded an average of 3/4 of a pound of crawfish. James added that when he resumed fishing in April, the average yield per trap was 1½ pounds; however, he did not fish all his traps at that time because he was unable to sell every crawfish that he harvested.
There was also a dispute about the price of crawfish during the period when James was unable to harvest. Dr. Huner testified that prices are generally 30 to 40 cents higher per pound once you get north of Bunkie, Louisiana. Dr. Huner was unable to recall ever getting more than $1.50 a pound at the university in March of 2001. Dr. Huner remembered that the price was much higher at the beginning of March than it was at the end of March. It was conceded by Dr. Huner that the price may have been $2.49 per pound the first day of the first cycle, possibly the result of the mean average temperature dropping from February to March in south Louisiana, but he noted that the price could have fallen 30 to 40 cents by the end of the week because crawfish prices can be volatile. Dr. Huner explained how buyers will sometimes offer high prices as an enticement to get crawfish farmers to harvest.
Dr. Lutz testified that as a result of a drought, prices were high throughout the 2000-2001 crawfish season. He referred to "unheard of" prices, and reports of prices even higher than $2.25 a pound. Mickey Johnson was a purchasing agent and manager for Gerald Savoie's Restaurant in March of 2001. Johnson described crawfish prices in March of 2001 as being "real high." Barker declared in his affidavit that during the latter part of March of 2001, the average price of live crawfish wholesale was $2.49 per pound. Mr. Christ testified that the price in March of 2001 was up to $2.99 per pound due to a shortage of crawfish.
As a measure of damages, Greenhead offers a calculation multiplying the price per pound by the average pounds harvested per trap by the number of traps in order to determine the daily loss per acre. That figure is then multiplied by 200 (the number of acres) and 4 (number of days per cycle) to determine the loss per cycle. Greenhead argues that even using numbers favorable to defendants of $2 per pound and a 1/4-pound yield per trap, the resulting figure of $8,000 is still higher than the amount awarded. Of course, this calculation apparently does not take into account the costs that would have been incurred by Greenhead during the actual harvesting.
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury. La. C.C. art. 2324.1. The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991). We find no abuse of discretion in the court's award of $7,500 in damages for one missed cycle.[10]

*72 Loss of Business Reputation

Greenhead complains on appeal that the pumping of wastewater into Matt Lake caused a loss of business reputation. James asserted that sales were hurt after he began selling crawfish in April of 2001, and his buyers were asking him about the test results. James added that he would have been unable to sell all the crawfish that he could have harvested after the pumping incident. Mickey Johnson testified that when he learned that the water in Greenhead's crawfish pond had been contaminated, he did not buy crawfish from James until a few months later in July, when he had to buy from James through a broker because crawfish were unavailable elsewhere.
Dr. Huner explained that James could have sold his crawfish in other markets if he was unable to sell them in the local market because of lingering concerns about contamination. We find no manifest error in the trial court's denial of this claim.

Damage to Gate and Poles
Greenhead also argues on appeal that the trial court erred in denying its claim for compensation for the damages that were caused to a gate and poles on its property from heavy equipment being moved to the pumping site.
According to Richard Hall, Zone Manager for the Shreveport Department of Water and Sewer, there was a city right-of-way along Nash Street. A gate was across the right-of-way with a city lock on it; however, when Hall's crew went to access a manhole near Nash Street, the lock had been replaced. This lock was cut by a city employee. Hall failed to see a sign next to the gate that listed contact information. Because he was not contacted, James had no idea about the pumping on his property until he actually witnessed it.
James testified that the gate lock had been cut and the wooden gate poles had been slanted in an outward position. James stated that he could not recall any damage to the poles, only that they were offset. He took someone duck hunting in return for fixing the poles and installing a new gate. The hunt cost James between $400 and $500.
James admitted that the gate itself was not damaged, but he argued that it needed to be replaced in order to fit the poles that were being set. In addition, the poles were apparently not damaged either, but were only slanting. There was no error in the trial court's denial of this claim.

Damage to Levee
Greenhead next argues that the defendants are responsible for a breach of the levee between the crawfish pond and Matt Lake. James built the levee in order to prevent water in the wetlands area from going into Matt Lake during the summer. Once the levee was built, James could maintain a depth in the crawfish pond of 10 to 14 inches, with any overflow going into Matt Lake.
James estimated that about 70% of the levee had been breached. He testified that the significant damage was to the side of the levee facing the crawfish pond. There was also erosion on the top of the levee. Damage to the side of the levee facing Matt Lake was minimal.
*73 James stated that he reworked the damaged levee the following summer with a bulldozer that he borrowed from a fellow fireman who was starting a crawfish farm. In return for being permitted to use the bulldozer, James stocked the other fireman's crawfish farm with crawfish that James estimated were worth approximately $2,850.
Mr. Christ testified that it would take an additional 22.8 million gallons of water to raise Matt Lake one foot. Each six-inch pump discharged approximately 1,700 gallons per minute. At first one pump was used, then a second pump was added the next day. Byron Roberts, General Superintendent for Wicker, agreed that together the two pumps could discharge almost 4.9 million gallons per day.
Mr. Christ visited the pond within a day or two of being informed of the pumping by James. Mr. Christ saw that the levee had been breached. Although he found that the lake water was almost level with the levee, he thought that wind-driven waves had gone over the levee and breached it. Mr. Christ testified that adding millions of gallons of water to Matt Lake contributed to the levee failure. James estimated there was a distance of approximately 300 yards from the discharge point to the levee.
James testified that he did not see water going over the levee before the discharge pumps were installed. However, an entry in his logbook from February 26, 2001 states that "water is so high at peak that the levee is completely under water." Mr. Christ stated that he had been on Matt Lake probably a week before James discovered the pumps, and water had not breached the levee at that time. Richard Hall from the Shreveport Department of Water and Sewer testified that he believed the water was contained within the levee along Matt Lake at the time the shields were placed over the manholes near Nash Street.
The area around Greenhead's property had been subjected to heavy rain and flooding, which necessitated the pumping into Matt Lake in the first place.[11] It was not unreasonable for the trial court to conclude that it was just as likely that because of the volume of rain, there would have been a breach of the levee even without the pumping. The trial court was not clearly wrong in denying this claim.

Lost Opportunity to Receive Dirt
Greenhead contends that the equipment used in the pumping process prevented it from receiving free loads of dirt. Roberts from Wicker Construction testified that in addition to the pumps, which were on wheels, a track machine, backhoe, excavator, 500-gallon fuel tank, and the occasional pickup truck were also at the site.
The affidavit of Dennis Gore was accepted into evidence, with the agreement that Gore does not estimate dirt prices or sell dirt. Gore, the Superintendent of H & H Contracting, stated that because H & H's normal site for dumping dirt was not available, the company agreed to dump 30 loads of fill dirt on Greenhead's property in March of 2001 at no cost to Greenhead. Gore added that this dirt would normally cost $75 per load. Gore further stated that the delivery of dirt was not made as a result of "activity by Wicker Construction, Inc., whose equipment was blocking the road and/or pumping raw sewage on the Greenhead/James land."
Roberts guessed that the equipment was approximately 1,500 to 2,000 feet down the *74 road from the gate, which he thought allowed enough room for dirt to be dumped onto the property. Roberts testified that the equipment never blocked the road near the gate. James stated that based upon the location of Wicker's equipment, he did not think that Gore could have gotten his trucks onto Greenhead's property in order to dump the dirt.[12] James estimated that the distance from the gate to where the pumps were located was approximately a "couple of hundred yards."
The record is clear that Gore would have been able to dump the dirt at least somewhere inside the gate, as even James placed the pumps approximately 600 feet away from the gate. Accordingly, we find no error in the trial court's denial of this claim.

Freedom of Information Act
Finally, Greenhead asserts that it is entitled to damages resulting from Shreveport's failure to comply with his request for information under the Freedom of Information Act.
Wyche stated that after he received a letter dated March 15, 2001, from Greenhead's attorney on March 19, he turned over his entire file to the City Attorney's office. His entire file at the time essentially consisted of a letter that he had sent to DEQ and the EPA, as well as anything else in his possession that was related to the pumping to protect the treatment plant. Wyche would supplement his file whenever he received additional information, such as the test results. An assistant city attorney wrote to Greenhead's attorney on March 21 that the requested information was being gathered.
On April 3, 2001, Greenhead's attorney received from the City Attorney's office internal emails, the letter addressed to the EPA, and a summary of the test results. A portion of the information on the test results summary was concealed, which Wyche assumed was done because it referred to testing on property owned by others. Further information was provided to Greenhead's attorney in March of 2002, including a test results summary with no information concealed, as well as sewer overflow reports and what appear to be the actual lab reports. Wyche stated that he generally does not receive the lab reports, but he would get the summaries if he requested them.
There was no failure by Shreveport to comply with Greenhead's request for records, nor did Shreveport act unreasonably or without due delay in answering Greenhead's request for records. We agree with the trial court that this claim lacked merit.

CONCLUSION
We amend the judgment to increase the award of damages to $7,636. As AMENDED, the judgment is AFFIRMED, at appellant's costs.
NOTES
[1] Dr. Huner testified that water temperature needs to be in the 65°-70°F range in order for there to be significant crawfish growth. It was noted by Dr. Huner that the air temperature in the spring is generally higher than the water temperature. Dr. Huner added that molting, the process in which a crawfish becomes larger and sheds his old shell, will occur when the water temperature reaches around 50° to 55°, but the molting rate is very low at that temperature range. Dr. Huner also stated that crawfish hardly move when the water temperature is below a range of 50° to 55°. The feeding activity of crawfish increases as the water temperature increases.
[2] Dr. Huner found that for one-half the days in March of 2001, the average air temperature in Shreveport was below 55°. In fact, the average air temperature for the entire month, as measured at Shreveport Regional Airport, was 53.4°. There was no significant increase in air temperature until the very end of March, and it went up well above 70° in April.
[3] It was noted by Dr. Huner that even though the average air temperature for March was higher in 2002 than in 2001, 55.4° as opposed to 53.4°, James did not begin harvesting in 2002 until March 24.
[4] Dr. Huner recommended 20 to 24 traps per acre.
[5] Dr. Lutz testified that because James had a lot of fallen timber in the pond, he had suggested that James put the timber in piles in order to create more fishing lanes.
[6] Dr. Lutz thought that a prudent operator in James's position would put out 15 to 20 traps per acre.
[7] James testified that based upon his research, water temperatures in Cross Lake were above 55°.
[8] Byron Roberts, General Superintendent of Wicker, testified that the water being pumped was not necessarily sewer water, but was flood water.
[9] Wyche also remarked that fecal coliform is naturally occurring in area lakes.
[10] Greenhead also complains on appeal about the trial court's refusal to admit into evidence a water temperature report from a Shreveport water purification facility because the report was not included on an exhibit list. Generally, the trial court is accorded discretion concerning the admission or exclusion of evidence; a court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. Holloway v. Midland Risk Ins. Co., 36,262 (La.App.2d Cir.10/30/02), 832 So.2d 1004, writ denied, XXXX-XXXX (La.3/28/03), 840 So.2d 571. We find no abuse of discretion in the trial court's ruling on this evidentiary matter, nor do we find error in the trial court's refusal to require production of the document.
[11] Byron Roberts testified that his crew could not even see the manholes because they were under water.
[12] However, when later asked if the pumps would not have blocked where Gore was going to dump the dirt inside the gate, James replied, "I don't necessarily think so but again I'm going off what Mr. Gore told me."